MARK K. FRANK, Appellant, v. GRACE FRANK GREENHALL. ET AL.—
105 S. W. (2d) 929.

Court en Banc, June 5, 1937.*

*Note: Opinion filed at September Term, 1936, April 21, 1937; motion for rehearing filed; motion overruled at May Term, 1937, June 5, 1937.

*Daniel Bartlett, Lewis, Rice, Tucker, Allen & Chubb, Robert T. Burch* and *Milton H. Tucker* for appellant.

*Lashly, Lashly & Miller* for the Federation of Jewish Charities of the City of St. Louis, the Community Fund of the City of St. Louis and Temple Shaare Emeth Congregation; *Watts & Gentry* and *Louis B. Sher* for other respondents.

GANTT, J.—Action contesting the will and codicil of Nathan Frank, respectively dated November 28, 1930, and March 3, 1931. The pleadings present issues of unsound mind, including insane delusions and undue influence. At the close of the evidence for plaintiff (contestant) the court directed a verdict sustaining the will. Plaintiff appealed.

Nathan Frank was born February 23, 1852, never married, died of blood poisoning April 5, 1931, and his only heirs at law are nephews and nieces as follows: Plaintiff (contestant), Mark Frank of New York, and defendants (proponents), Alfred Frank of California, Brannette Krupp of Texas, and Grace Frank Greenhall of St. Louis. He was an able lawyer, successful in business, and left an estate consisting of stocks, bonds, accounts and real estate of

1234

the value of two million dollars. In the will he left the residue of his estate to trustees with directions to establish in St. Louis and St. Louis County a system of parks and playgrounds, or establish other designated charitable institutions. In the codicil he made a bequest to Temple Shaare Emeth Congregation and left the residue of his estate to trustees, with directions to pay certain annuities during the life of the trust, and directed that the income during said time be paid in equal shares to his nieces, Brannette M. Krupp and Grace F. Greenhall, and his nephew Alfred Frank, and directed that at the end of ten years the trust estate be equally divided between said nieces and nephew. In all other respects the will was confirmed. Plaintiff was not mentioned in the will or codicil.

On April 9 and 10, 1929, Mr. Frank was in the Jewish Hospital in St. Louis. He was afflicted with general hardening of the arteries and enlargement of the prostate gland, from which he suffered for ten or twelve years. He also had been afflicted for several years with sugar in the urine. The pupils of his eyes were small and reacted little to light and accommodation, blood pressure one hundred sixty-two over ninety-four, and his blood vessels tortuous and hardened.

In July, 1930, an automobile in which he was riding overturned and his head struck the car, causing a small lump. Thereafter he complained of rumbling in his head and numbness in his hands, and a month later stated that he felt the nervous shock of the accident. Immediately after the accident he consulted two neurologists, a chiropractor and a surgeon.

He was again in said hospital from August 23 to 28, 1930. At that time he continued to suffer from said afflictions and was troubled with retention of urine, decayed teeth and bone involvement, and anesthesia of the left hand.

On February 26, 1931, he was again in said hospital and remained until death. On entering he was drowsy and unable to void urine and had been catheterized two days before entering the hospital. The pupils of his eyes were contracted, tongue somewhat dry, blood pressure one hundred sixty-eight over ninety, heart slightly enlarged, heart murmur, knee jerks absent, catheterized twice that day and urine bloody.

Morris J. Levin testified that he was a lawyer and officed with Victor Packman in the Nathan Frank suite of offices; that he met Mr. Frank a number of times at his office and home; that on November 28, 1930, Mr. Frank requested him and Arthur Jones to witness his will; that he signed the will in their presence and they signed as witnesses in his presence and in the presence of each other, and that the instrument exhibited is the will executed by Mr. Frank on that date. Thereafter he saw Mr. Frank in the office and about the building until the latter part of February, 1931, when

Mr. Frank went to the hospital, where he saw him on one occasion; that he had conversations with Mr. Frank and observed his actions from day to day; that he was not only of sound mind on November 28, 1930, but had a brilliant mind, and he never doubted his sanity.

Arthur P. Jones testified that he was a real estate broker and officed across the hall from Nathan Frank; that he had known him nine years; that he was frequently in his office, and that Mr. Frank was occasionally in his office; that they met in the halls and elevators; that he consulted Mr. Frank in 1927 with reference to a real estate matter; that on November 28, 1930, he and Mr. Levin witnessed the instrument exhibited in court as the will of Mr. Frank; that Mr. Frank signed the will in their presence and they signed as witnesses in his presence and in the presence of each other; that before the execution of the will Mr. Frank stated the law with reference thereto; that he was a man of sound mind, and on the day the will was executed was of sound mind.

Dr. Sim Galinson testified that he was an interne for two years in the Jewish Hospital, St. Louis; that he attended Nathan Frank as such from February 26, 1931, and visited him several times a day until his death; that he was afflicted with enlarged prostate gland, diabetes and hardening of the arteries, and was drowsy and pallid when he entered the hospital, which indicated a decreased amount of red blood cells; that he was slightly toxic at that time, which disappeared after the retention of urine was relieved; that drowsiness left him within a day or two; that he examined his blood on February 26, March 6 and March 24, 1931, and found no poisons; that his condition was normal, which means that the kidneys were properly functioning; that he found no indications that urine had backed into the kidneys; that on March 3, 1931, he and Mildred Seybold (formerly Mildred L. Erwin), the day nurse attending Mr. Frank, witnessed the codicil to his will; that Mr. Frank signed the codicil in their presence and they signed as witnesses in his presence and in the presence of each other; that the exhibit dated March 3, 1931, is the codicil they witnessed at the request of Mr. Frank; that his condition improved from the beginning; that he was being prepared for an operation the next day and that he was perfectly normal and of sound mind until five or six days before his death.

Mildred L. Seybold (formerly Mildred L. Erwin) testified that she was the day nurse attending Nathan Frank at the Jewish Hospital and was continuously with him until his death; that he was a wonderful patient, always pleasant and jolly and was taken in a wheel chair to the sun room from March 10 to March 15, 1931; that on March 3, 1931, she and Dr. Galinson witnessed the codicil to his will; that he signed the codicil in their presence, and they signed as witnesses in his presence and in the presence of each other; that

1236

the instrument exhibited which is dated March 3, 1931, is the codicil they witnessed at the request of Mr. Frank; that he submitted to prostate gland operations on the next day and on March 17, 1931; that his mind was perfectly clear until four or five days before his death, except that he was under an anesthetic during the operations; that at the time he executed the codicil he appeared to be absolutely clear and sane; that he dictated the codicil to Miss Sensenbrenner, his secretary, on the afternoon of March 2, 1931; that he said Miss Coleman, his chauffeur, could not witness the codicil because she was a beneficiary under the will; that as nurse she adjusted the bed to place him in a sitting position and braced his back with pillows; that he read the codicil, asked for a pen, signed the codicil, placed other papers in a brown envelope, wrote something thereon, sealed the envelope and handed it to Miss Sensenbrenner; that thereafter he said he had changed his will because he had given enough to charity and preferred to have his nieces and nephew have the residue of his estate.

In this connection and on the question of the credibility of the witness, it should be stated that Mrs. Seybold admitted making two written statements in which, among other things, she stated that Mr. Frank told her that he had a sum of money belonging to Esther Ann Hansel; that after his death Mrs. Hansel persuaded her to make said statements; that Mr. Frank made no such statement to her and that the statements to that extent are untrue.

The above-stated evidence made a prima facie case of due and formal execution of the will and codicil and of soundness of mind of testator at the time of the execution of said instruments. In substance the testimony for plaintiff (contestant) follows:

Jesse L. Bowling testified that he resided in New York City, was an architectural engineer and first met Nathan Frank in 1926-1927; that in 1927 or 1928 Mr. Frank came to his office several times in connection with plans for a building in St. Louis; that he met him in November or December, 1930, in St. Louis; that he had data and sketches of the building which he later sent to him in New York; that he was in conference with him an hour or an hour and a half; that he met him in January, 1931, and was in conference with him an hour and a half or two hours; that during the conference his head would droop on his chest as though sleeping; that in a few seconds or probably a minute he would awaken or become aroused and inquire what they were talking about; that his mind seemed to wander and his manner of conversation was not the same as two or three years prior; that sometimes he did not answer promptly, and it seemed that he would actually fall asleep; that on coming out of a spell he would not continue the conversation in a clear manner; that the drooping spells occurred several times during the conferences; that he told Mr. Frank he would let him know about

the project in February; that he kept pressing for an opinion and he told him it would not be a financial success; that later he wrote him advising against the project; that during a conference he casually mentioned that he knew Mark Frank of New York and inquired if he was a relative, and he answered that he was; that it could be possible that Mr. Frank was meditating during the spells but he did not think so; that in every other respect he disclosed extraordinary intelligence of a high character, knew figures, analyzed them, gave his conclusions in a rational manner and acted in the usual ordinary manner of an astute business man discussing an important business problem.

Anna Sensenbrenner testified that she was private secretary to Nathan Frank from June 1, 1927, until his death; that she cared for his correspondence, account books, banking, and in a general way his real estate, stocks, bonds, insurance and household accounts, and that she was authorized to sign his name to checks; that he was an unsuccessful candidate for the Republican nomination for United States Senator in 1928; that he contemplated a contest but Mr. Hoover, candidate for President, thought a contest would disrupt the Republican Party, and urged him to abide the result; that Mr. Frank thought he would be appointed to the cabinet or other important position and did not contest; that he did not want an ambassadorship and stated that an appointment to such a position would be ridiculous in view of the fact that all of his "girl friends" were in the States; that he contributed liberally to Republican campaigns and continued to believe that President Hoover would appoint him to an important position; that he said the red carnation in his buttonhole had a significance to "girl friends;" that he gave money and made expensive gifts to said friends and arranged charge accounts for them with department stores; that after doing so he would complain about the accounts and insist the stores should control the amount of purchases; that the stores would do so, and he then would complain because they did so; that on a "girl friend" threatening to sue him, he paid her thirty or forty thousand dollars for letters he had written; that later he paid her another large sum for photostatic copies of said letters; that during 1930 and thereafter he was not active in the practice of law but active in stocks, bonds, real estate, politics and civic affairs until his death; that she observed no change in him until he was injured in an automobile accident July 15, 1930; that he had a small lump on his head and was very nervous as a result of the accident; that thereafter he made an automobile trip to Canada, and with his chauffeur returned to St. Louis August 20, 1930, because of illness; that after the accident he frequently was speechless and complained of a tingling sensation in his hand and pain in his head; that he was listless, drooped and physically weak; that these lapses were frequent

and on two occasions were severe; that when confined to his home the chauffeur, who also was the maid, conveyed her to the home that she might discuss with him mail and business transactions; that he dictated many letters and while doing so it was not uncommon for him to lapse for thirty or forty minutes; that in 1930 he thought his office associates were "nosing into his business" and moved across the hall; that he frequently napped on the office lounge; that after the automobile accident she noticed he was forgetful and had "delusions" as to the time of day; that he had an appointment with a woman for Tuesday and expected her Monday, thinking it was Tuesday; that on Tuesday the woman appeared and at first he refused to meet her; that after having his watch repaired he complained that it was no good; that she discovered he had not been winding the watch; that if he quarreled with a "girl friend" in his home he would be irritable that day in the office; that he complained that his friends did not visit him; that he financed a radio appliance named for him, which business went into liquidation; that he said he had diabetes but would write friends the contrary; that he was childish, fastened napkins in his collar, ate grapefruit and then squeezed the juice into his spoon, saying that it contained quinine, which was good for him; that he insisted she taste something he had ordered and he would taste something she had ordered; that he pounded on the table and screamed for better service; that he kept a woman chauffeur for economy and because a man chauffeur might become involved with the girls about his home, for which he might be blamed; that he said after the automobile accident that the doctor told him that he was not physically and mentally able to practice law; that a year and a half before his death a musician sold him the Nathan Frank March and he gave her a copy; that he endorsed a note for Frank Yampolski to learn aviation; that he discussed with Yampolski the question of a Nathan Frank good will flight in 1930; that after the automobile accident he consulted Doctors Graves and Schwab; that on December 6, 1930, he went to Syracuse or Boston to a stockholders' meeting and returned in a few days completely exhausted; that at the hospital he said he wanted to dictate a codicil to his will and told her to bring the form book; that at the time he dictated the codicil his hands were hot, eyes red, voice queer and jerky and he was weak; that she brought the form book from the office, and on those present leaving the room he dictated the codicil, using the form book, a number of papers on the table, and she thought a copy of the will; that in dictating he frequently hesitated; that on completing the dictation he told her to return to the office, write the codicil and bring same to the hospital with the will; that on returning to the hospital with the will and codicil she found relatives and the nurse in the room; that he asked them to leave the room and she then gave him the codicil

and will; that she told him Mr. Meissner had telephoned about the will, and he was furious; that he said when he got well he would make a new will; that he read the codicil, made certain corrections, including the misspelling of the word "discretion" three times, and then executed it, which was witnessed by Mildred L. Seybold and Dr. Galinson; that the relatives were called to the room and he read the codicil to them; that he then fastened the codicil to the will, placed them in an envelope and gave them to her for safe-keeping; that he told her if anything happened she should destroy the private letters in his desk; that when in the hospital he asked her if she had done so, and she said no; that he said she should take them to her home, which she did; that on his death she went through the letters looking for papers that should be turned over to the estate; that she gave these private letters to her attorney; that she did so because she intended to sue the estate because Mr. Frank had not appointed her executrix; that he was failing on November 28, 1930; that she did not write the will and did not know when it was written; that on November 28, 1930, the date of the will, he told her to place said will in the safe deposit box and destroy the old will; that she did not destroy the old will but gave it to him, and he destroyed it, throwing it in the waste basket; that in his absence she gathered the torn pieces of the will from the basket and delivered them to her lawyer, who arranged the torn pieces, fastening them together, and then had a photostatic copy made of the old will; that she also gave to her attorney his private letters.

George B. Logan testified that he was attorney for Esther Hansel; that in the summer of 1930 he visited Mildred L. Erwin, now Mildred Seybold; that he had with him the two statements in writing made by her; that she stated Mr. Frank told her that Mrs. Hansel pleaded with him to will his property to relatives rather than for playgrounds and parks, and she said that part of the statement was true.

Esther Hansel testified that she was introduced to Nathan Frank by Governor Brewer of Mississippi on May 5, 1923; that Mr. Frank told several people that Governor Brewer was her uncle; that she asked him why he did so; that he said it would give her prestige and she asked him to quit circulating such a story; that when she first met Mr. Frank she was living at the Buckingham Hotel and was a bond saleswoman; that after meeting him and on the first day of June, 1923, she moved to the Chase Hotel where she resided until January 17, 1927; that while at the Chase she did not work all the time; that it was not necessary for her to do so; that she spent a month in Mr. Frank's home with the maids and she sometimes called him Uncle Nat; that after she married she lived in his home several weeks; that she frequently marketed for him over a period

of nine years; that she did not employ or discharge the servants, but had a key to the house in his absence and was asked to "keep an eye" on the home when he was not in the city; that on one occasion she went to the home, found the house lighted and the maid entertaining; that the next morning the maid left the home; that he made frequent trips in those years and that she had taken trips with him; that in 1926, she accompanied him and a friend to New Orleans; that he paid for the food but she paid her hotel bill; that she also made trips to various towns in Missouri with him and a "girl friend;" that in November, 1928, she and Mrs. Marquis went with him to Washington, Virginia Beach and New York and returned the day before Thanksgiving; that Mrs. Marquis lived at his home with her children; that she (Mrs. Hansel) frequently dined at his home and at times his nieces and nephews were present; that his niece Mrs. Greenhall was lovely to him and he felt kindly toward her; that she remembered the automobile accident in July, 1930; that he complained of dizziness and numbness in his hand; that she and her husband daily visited him at his home during the week between the accident and his departure for Canada; that he was dressed and usually reclining on a lounge; that he was taken to the hospital in the early part of 1931, and that either she or her husband daily visited him; that she knew he had made a will giving his property to charities; that shortly after he went to the hospital and while they were alone she conferred with him as to the disposition of his property; that when she spoke about the matter he became excited; that the nurse asked her to leave; that on the next day she again conferred with him about the matter; that he said his relatives had not been kind to him; that she explained they had been as nice to him as he would permit them, and that they might have been more attentive if he had permitted them to visit his home at pleasure; that after they argued the matter he said she was right and asked for suggestions; that she made notations on little white slips of paper indicating what she thought he should do with his property; that he wanted to give some adopted nieces and nephews $15,000 instead of making them equal with his nieces and nephews; that he finally agreed she was right; that he objected because his nephew, Alfred Frank, married a gentile girl; that she told him any gentile woman who adopted the Jewish faith and so reared her children was entitled to as much as the blood relatives; that he agreed with her and she made a notation of $50,000 to each of the nephews and nieces; that he said he would give $5000 to his chauffeur; $2500 to his maid and housekeeper, and $2500 to his former secretary; that he said he was taking care of Miss Sensenbrenner, his then secretary; that they discussed the promise of $50,000 he made to Mr. Meissner; that the notation in favor of the former secretary was for $5000; that he asked her what she thought of

the community fund, and she suggested $3000 a year for a certain period but that he made it $5000 and made provisions for Jewish societies; that he dictated some of them to her; that she suggested them as she wrote them down and that there were quite a lot of little white notation slips; that the balance of the estate was to be divided equally between his nieces and nephews; that after writing their names she inquired about the family of his brother who died in a Chicago hospital and he answered: ''They are dead;'' he said: ''Yes, he is dead;'' that at the time she did not know the name of plaintiff; that Mr. Frank was very irritable and ugly about the matter and she had a tremendous argument with him about it, and that he said when he got well he would change the will; that no one could dictate to him; that she believed she saw the notations made by her in Mr. Frank's office when she interviewed the executors after his death; that she became acquainted with Mildred Erwin, now Mrs. Seybold, in January, 1931, when she (Mrs. Hansel) was ill at Barnes Hospital; that Mrs. Seybold nursed her for a week; that she next saw her in the Jewish hospital as a nurse to Mr. Frank; that after his death she did not influence Mrs. Seybold to make the statements signed by her and introduced in evidence.

C. F. Jackson testified that he was credit manager of Famous-Barr and acquainted with Nathan Frank, a brilliant man and able lawyer; that the last five years he seemed feeble and was ''wishy-washy'' for a year or two before his death; that he would give and cancel orders to permit women to buy merchandise on his account; that thereafter when women made purchases he would report to Mr. Frank, who would say: ''All right, let 'em go,'' and add: ''but nothing else;'' that Mr. Frank would caution him to use his judgment and add: ''Don't let them put it over on you;'' that thereafter he limited their purchases; that a young woman bought shoes of the value of $75 and dresses of the value of $300, and that he (Jackson) refused to O. K. more than one pair of shoes and one dress; that another woman ran a bill to three or four thousand dollars; that during the time she was making purchases he kept Mr. Frank advised, who told him to go ahead; that when bills were presented he would object and say that it should be stopped; that he (Jackson) then would refuse to sell them, and Mr. Frank again would approve the purchases; that during the last six months he seemed more feeble physically and mentally, and was irritable and changeable; that he permitted Mrs. Hansel, wife of Dr. Hansel, who before her marriage was known as Mrs. Lyle, to buy merchandise for his home; that Mr. Frank guaranteed Mrs. Hansel's account to $300, but she paid her own account.

Julius R. Field testified that he was secretary to the Mayor; that in 1930 Nathan Frank said that he had given a band stand to St. Louis and that it was not being used; that he thought it was a

shame for he had spent money building the stand; that he wondered if concerts could not be held in the stand; that he (Field) said he would look into the matter; that Mr. Frank suggested that he might sponsor a contest, giving a cup or several cups to the best high school band, grade school band and parochial school band in the city and county; that he told Mr. Frank the school board would cooperate because it would promote an interest in music; that Mr. Frank said he would give a cup or series of cups and that they would hold contests in other cities and universities and make a music center of St. Louis; that they all got busy and prepared for the contest; that they wanted $175 for twelve cups; that Mr. Frank said that was too high and finally they purchased the twelve cups for $120, that the contest was held in 1930; that Mr. Frank visited each band and presented a cup to the winner; that after the contest Mr. Frank said they should get ready for next spring; that afterwards he said he was not going on with it.

Harry Jones testified that he was a lawyer and became associated with Mr. Frank in December, 1927, leaving his office in February, 1930; that he was assistant campaign manager for Mr. Frank when he ran for the Senate; that he was defeated for the nomination and believed, as most of them did, that he was not honestly defeated; that after the election he expected an appointment to the cabinet or some other important position, and he said he had been assured by President Hoover that he had him in mind; that Mr. Frank was unassuming and spoke very little; that he said he was going to do something for Mr. Yampolski; that he put a few thousand dollars in a radio company; that Mr. Frank mentioned the Krupps and Greenhalls, but that he (Jones) never heard of plaintiff; that he had seen Alfred Frank and Mrs. Greenhall in Nathan Frank's office; that Mr. Frank said that Mr. Sher knew too much about his business and that he would like to get rid of him; that he exhibited in the office several sheets of the Nathan Frank March and was disappointed because it was not generally used by the bands in St. Louis; that he had postal photographs made of the Nathan Frank band stand and distributed them in the office, asking that they be used if occasion arose; that Mr. Frank was a graduate of Harvard and that he (Jones) never discussed law questions with him but did discuss business matters, and that he was a man of sound mind.

Mark Frank testified that he was a nephew of Nathan Frank and the plaintiff in the case; that he was born in St. Louis, son of Louis and Emma Frank, fifty-seven years old and in the iron and steel business in Pittsburgh and New York under the name of M. K. Frank; that he was never known by the name of Hirsch; that his family lived in St. Louis until he was ten years old, when they moved to Chicago; that his uncles Gus, Joe and his father were in the dry goods business in Chicago until the Columbian Expo-

sition; that his father then engaged in the commission business; that his father and mother separated and were divorced in 1901; that in a few days she married Louis J. Hirsch, who died ten years ago; that after the marriage the mother and stepfather made a trip around the world; that he visited them when they returned to Chicago; that they did not remain in Chicago but kept traveling because of the stepfather's health; that he worked for his stepfather in Chicago two or three years in the iron and steel business and when twenty-one years old he went to Pittsburgh and operated a business for his stepfather; that after two years his stepfather gave him the business; that when he lived in St. Louis he often saw his Uncle Nat, who wanted him to study law; that Uncle Nat stayed with them when at the World's Fair in Chicago; that the last time he saw Uncle Nat was at Long Branch, N. J., fifteen years ago; that he met him in a hotel and that Uncle Nat said: "Hello, Markie, how are you," and asked about his mother; that he asked him why he had not sent him some remembrance of his father; that he said: "Your father left nothing, I will take care of you sometime," and walked off leaving him standing there; that during the lifetime of his father he wrote to him and the father answered the letters; that he had not heard from him for quite a while and finally received a letter from Uncle Nat enclosing a letter he had written to his father; that Uncle Nat did not write a letter to him but wrote on the envelope of the letter to his father that his father died in a hospital in Chicago on a certain date; that he then enclosed the letter to his father in an envelope and mailed it to him; that while living in Chicago he visited St. Louis three or four times a year; that he was in St. Louis but once during the time he lived in Pittsburgh, and on that occasion he went to Uncle Nat's office and also telephoned; that when in St. Louis he stopped with his mother's relatives and would be there only a short time; that he never corresponded with any of his uncles, aunts or cousins; that he and his first wife were adopted by his stepfather after his father's death, but that his name was not changed to Hirsch; that during the time his mother and stepfather were on the trip, he did not live with his father but rented a little apartment; that for years after his father's death he sent a check to A. L. Hirsch in St. Louis to place flowers on his father's and stepfather's graves on Decoration Day; that the first time he saw his father's grave was when his stepfather died ten years ago; that he (Mark) had been married three times, and that his wives were gentiles.

Anton Becker testified that he worked for Famous-Barr; that he was acquainted with Nathan Frank and they were good friends; that the last time he had business with him was in 1929 or 1930 when he sold him some slip covers; that Mr. Frank instructed him to confer with his housekeeper about the slips; that he noticed that

he was irritable and not like himself; that he went to the home the next day and started cutting the slip covers; that a woman said: "What are you cutting? Who told you to do this?" That he said: "Well, pardon me, who are you?" And she said: "Never mind who I am, just do as I tell you;" that he could not reach Mr. Frank at his office and stopped cutting the silk; that the woman said she would select the material; that after another selection the woman objected, and on the third selection the covers were cut; that after the second selection Mr. Frank said: "Well you know, old boy, after you get old the women get you sooner or later;" that he saw him again and there was a great change in him; that formerly he would say just a word, but at that time he spoke of one thing and then another.

Frank Yampolski testified that he was the out-state manager for Nathan Frank during his campaign for the Senate; that Mr. Frank expected a position in the cabinet or some other important position; that he said after the automobile accident he had not a moment of his own and that his niece was a regular "hell cat" and continually hounded him; that he lunched with President Hoover and was to have an important position in recognition of his services to the party; that a year later he said he had declined an insignificant ambassadorship; that until his death he continued to believe he would be appointed to an important position; that he said he did not love any of his "far away relatives and supposed friends," and that he would leave him (Yampolski) money to make him independent; that he said he lost $50,000 in the radio company and that he (Yampolski) took charge of the business, organized a $15,000 company and attempted to salvage something from the business; that at the time Mr. Frank said Mrs. Greenhall was ungrateful and continually "sponged on him;" that he said his nephew in the east was a debonair type of fellow and never asked for anything; that Mr. Frank arranged for a loan to finance him at the aviation school; that he (Yampolski) was in an accident and suspended; that he told Mr. Frank he thought a flight with short stops to Seattle, through Canada, Alaska, China and India would be good advertising for St. Louis; that Mr. Frank was to pay the expense, thought it an excellent idea and that it should be called the Nathan Frank Invitation; that he saw Mr. Frank four times a week during February and March, 1931, about the matter; that on one occasion at the hospital he heard moaning and on entering the room saw Mr. Frank sitting on a pan with water on the floor; that he placed him in a chair and Mr. Frank said: "Why should I have to go through with a major operation;" that he was an old man and the family could wait; that they were like a bunch of vultures and buzzards; that he spoke about a will and said the family was trying to get away with him for his money and were hounding him to death; that he had

made his money in St. Louis and wanted to do something for the city; that he wanted to build fountains throughout the city and beautify the parks; that the colored people supported him in the campaign and that he wanted to do something for them, and that he wanted to leave him (Yampolski) $100,000 to make him independent; that he said he had executed a codicil; that he was drawn, haggard and completely worn out; that he said he gave $1000 to purchase a flying field and it should have been called Nathan Frank Field rather than Lambert Field, because Mr. Lambert only contributed $50; that he said Mr. Sher (an associate) was not the man he believed him to be; that he could not trust him and that he knew too much about his women friends; that he noticed a change in Mr. Frank after the automobile accident; that he was trembly, his hands shook and he said he felt very rotten; that he would go to sleep and on awakening would ask him to repeat; that he visited him at his home and he complained of being ill and stated that he was not able to get around; that he saw him pacing up and down in his office and mumbling to himself; that he noticed hoarseness in his voice and asked about it; that he said he had made a trip to Chicago with a lady friend, ate lobster, drank and had a big night and that he was going to the hospital for an operation to please his relatives; that he said: "I may get dreams but I will be all right—due to this excitement I feel a rumbling in my head;" that he mentioned a chiropractic woman who was treating his spine; that he took the blue prints to the hospital at Mr. Frank's request and that the nurse did not ask him to keep away; that Mr. Frank said he was forced to sign the codicil and that as soon as he was well he would remake the will; that his mind was clear other than his "highly tempermental excitement" when he would refer to relatives and the operation; that this was his opinion based on his contact with Mr. Frank from 1928 to a week before his death; that when he was calm and collected he spoke clearly, but at times he would pace up and down like a lion; that when he talked to him about business matters he talked like a man of sound mind until about a week before his death; that he filed a claim against the estate for $100,000 based on a promise Mr. Frank made to him in the hospital; that he did not worry Mr. Frank by visits and that the nurse did not repeatedly tell him that Mr. Frank did not want to see him; that he did not watch until the nurse left the room and then slip in with his blue prints; that the nurse told him that Mr. Frank advised her to admit him at any time and that she did not tell him that she did not want Mr. Frank disturbed; that he knew that Mr. Frank's relatives dined with him regularly every week on a certain night; that other than his highly tempermental excitement he seemed normal and acted like a man of his age; that Mr. Frank loaned him $1265 to take a course at the flying field and that he never repaid it.

Nellie Mueller testified that she was a waitress in the restaurant at Famous-Barr; that Nathan Frank patronized the restaurant and was last there in the fall of 1930; that during the last two or three years he was disagreeable, bad mannered and confused with reference to his orders for lunch; that during the last year or two he would blow his nose in the napkin and order another one, and that he would expectorate on the floor.

Albert Yampolski testified that in September, 1930, he saw Nathan Frank walking back and forth in his office, waiving his hands, growling and talking to himself; that he did so for an hour, and that on another occasion he saw him acting in the same manner; that in company with his brother Frank, he met him at the Jewish Hospital on the Sunday before he died; that he said: "You have a nice brother; I like him very much; some day I will see that he will be taken care of and be a rich man;" that he talked about airplanes and said that he would beautify the city and provide parks when he recovered.

Fred Z. Salomon testified that he had been manager of Famous-Barr for thirty-five years and met Nathan Frank in 1900; that Mr. Frank was then general counsel for the company and was a well groomed and brilliant gentleman; that from 1925 he had pronounced peculiarities; that he was disagreeable, aggressive and thought he was a big man politically, socially and financially; that in the early days he had good manners and was a brilliant attorney but that he became quarrelsome, argumentative and exhibited bad table manners; that he complained of people hanging on to his coat tails and climbing through his efforts; that he spoke of being taken into the cabinet of the President; that ten or fifteen years ago Mr. Frank introduced him to Mrs. Lyle, now Mrs. Hansel, as a bond saleswoman; that he said she came from a good family of considerable means; that she had left her money with him and was perfectly responsible; that she had funds with him and that he would see her account was paid; that he authorized her to buy on his account for his home; that he spoke of his prowess with women and had a strong preference for blonds; that at that time he was seventy-five years old; that he would give instructions on a charge account for women one day, take exceptions the next day, and then criticize the company for obeying the orders; that in 1928 or 1929 Mr. Frank wanted to know why he had been dropped as a director by the May Department Stores Company; that he told him he had been dropped for many reasons and instanced many things done by him which the directors considered wrong; that he told him the company resented some of his bills for services that he had not performed; that Mr. Frank did not express resentment but tried to explain the charges; that none of the occurrences he was testifying about occurred after November 28, 1930.

On cross-examination Dr. Sim Galinson, the interne, testified that at the time Mr. Frank entered the hospital he had a discomforting retention of urine; that retention sufficient to back urine into the kidneys is an impairment; that an adjustment of the bladder takes place on complete retention; that the kidneys excrete waste in the form of urine and their complete failure to function results in death; that a full bladder is painful and might crush the inside of the kidneys; that uremia means poison in the blood, which might be caused by impairment of the kidneys; that the poison reaches every part of the body, including the brain; that in Mr. Frank's condition blood in the urine would indicate that a distention of the bladder caused a little break in some of the blood capillaries in the bladder wall; that at times bloody urine came from him; that it might have been due to trauma, inflammation of the bladder or insertion of a catheter; that when he came to the hospital he did not have uremia; that one might have some toxicity due to any kind of irritation or infection; that when he came to the hospital he was drowsy and pallid, a symptom of anemia, which means a decreased amount of red blood cells; that hardening of the arteries tends to decrease the blood through the brain; that if one became drowsy, tired and frequently slept, that would indicate a diminished flow of blood through the brain; that there are other causes for drowsiness; that at the time Mr. Frank was in the hospital he did not mention an automobile accident; that he had no fever, was not toxic and was not suffering pain on the day he signed the codicil; that at no time did he suffer pain to a startling degree; that blood poisoning did not appear until three or four days before his death, and there was no toxicity; that prior to that time there was no uremic poisoning; that when he came to the hospital he was slightly toxic, but, on relieving the retention, the toxicity disappeared; that arcus senilis is a ring around the iris of the eye, which indicates old age; that in Mr. Frank's condition profuse perspiration indicated exhaustion; that a fourteen thousand white blood count in a person seventy-nine years of age suffering from retention who had broken into a profuse perspiration indicated that he had an infection in his blood and toxicity throughout his system; that a dry tongue indicated loss of fluid from the body; that he did not believe Mr. Frank had anesthesia; that he thought the hospital record to that effect was wrong; that what was meant was paresthesia, or a tingling sensation which is caused by circulatory disturbance; that he could not have had anesthesia because he had no nerve injury; that certain circulatory cerebral symptoms indicated decreased blood supply to the brain; that usually bad teeth would not result in toxicity and in Mr. Frank's case feeble tendon reflexes indicated general senility; that he found no indications that urine had backed into Mr. Frank's kidneys; that the drowsiness left him within a day or two after he came to the hospital;

that the word "senile" has reference to changes that occur during old age; that it does not necessarily mean a deficient mind; that he remembered making the entry in the hospital records on March 1, 1931; that Mr. Frank's general condition was good; that he was wide awake and not drowsy; that on February 27, March 6 and March 24 they made an examination of his blood and found no poisons, the functioning of the kidneys was normal and his general condition normal.

Dr. James F. McFadden, whose qualifications are admitted, testified for defendants (contestants). He interpreted the daily hospital chart made by the nurses and interne during Nathan Frank's confinement in the hospital. The testimony given by him on the charts covers twenty-four pages of the printed abstract. The chart is a correct daily record and there is no controversy as to the ailments of Nathan Frank or his condition while in the hospital. It will be sufficient to state that he explained the medical terms and abbreviations used in the chart, and from the chart gave his opinion of the condition of Mr. Frank from day to day with reference to infection, blood pressure, exhaustion and other conditions resulting from hardening of the arteries, sugar in the urine and enlarged prostate gland.

■ I. Plaintiff contends that the testimony of his witnesses is substantial evidence tending to show that Nathan Frank, at the time he executed the will and codicil, was of unsound mind and possessed of insane delusions.

The testimony shows that for several years he was afflicted with diseases common to old men. He lost physical and mental vigor. He was argumentative, quarrelsome, suspicious and exhibited bad table manners. He wanted to be remembered by the people of St. Louis, which subjected him to the schemes of unscrupulous persons. The private secretary, Miss Sensenbrenner, testified that during 1930 and thereafter he was not active in the law but active in stocks, bonds, real estate, politics and civic affairs. On October 10, 1930, she wrote to Eli G. Krupp, husband of defendant, Brannette M. Krupp, as follows:

"Mr. Frank has improved very much since you last saw him and I am sure he will continue to get better if we can only keep him home a while longer. He has certainly been very obedient to the Doctor's orders especially in regard to remaining at home, which I imagine in Mr. Frank's case is a rather difficult thing to do and feel content about doing it inasmuch as he has been and still is, so active. However, I believe his interests are being well looked after and he has found he can engineer his affairs very well from his home."

At the trial she testified that he commenced to decline from the time of the automobile accident and was failing on November 28,

1930, the date of the will. The hospital record of his confinement in the hospital in August, 1930, and from February 26, 1931, to his death contains no reference to an automobile accident. From this it is clear that the small bump on his head and the nervous shock resulting from the accident in no way affected his physical or mental condition. The neurologists who treated him after the accident were not called as witnesses. Furthermore, he left an itinerary before starting on a trip to Canada after the automobile accident and required regular reports with reference to his affairs. On the trip he directed her by letter with reference to said affairs. Quite a number of these and other letters are in evidence. They were business and friendly letters and showed that Nathan Frank during the last years of his life was active in business and retained a lively interest in his friends and relatives with whom he associated. Before and after the automobile accident he had many conferences at his home and office with lawyers and business men. Of course, in view of his large business affairs he engaged the services of others, including his associates in the law.

She also testified that in dictating the codicil he was weak, hesitant, jerky and exhausted. Of course, he was hesitant for he made frequent references to the form book, will and other papers, but he dictated without mental lapses and later read the codicil to relatives and others present. It is significant that she did not testify that he was of unsound mind at the time of the execution of either the will or the codicil.

On the question Mr. Bowling testified to mental lapses, but he also testified that aside from said lapses, Mr. Frank disclosed extraordinary intelligence, knew and analyzed figures, gave conclusions in a rational manner and acted as an astute business man when discussing important business problems.

Mr. Yampolski also testified that aside from "highly temperamental excitement" when he referred to relatives and the operation, he talked of business matters as a man of sound mind until a few days before his death.

Under the authorities the above-stated testimony for plaintiff was not substantial evidence tending to show that Nathan Frank was of unsound mind at the time he executed the will and codicil. [Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739, Id., 37 S. W. (2d) 430; Sayre v. Trustees, Princeton University, 192 Mo. 95, 90 S. W. 787; Hall v. Mercantile Trust Co., 332 Mo. 82, 59 S. W. (2d) 664; Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772].

In this connection it is contended that he was possessed of an insane delusion that plaintiff had changed his name and was possessed of an insane delusion that plaintiff was dead.

Mrs. Hansel inquired of him about his brother's family in Chicago, and he said: "They are dead,—yes, he is dead." The statement

·"yes, he is dead" was a correction of the statement "they are dead." The father of plaintiff was dead and Nathan Frank knew that plaintiff was not dead, for he spoke of him as living to Yampolski in March, 1931, and in December, 1930, or January, 1931, he was told by witness Bowling that plaintiff was living in New York. Furthermore, the belief of Nathan Frank that plaintiff had changed his name to Hirsch, the name of his stepfather, was not unreasonable in view of plaintiff's adoption by the stepfather. He may have inferred or been told that plaintiff had changed his name. An insane delusion is a false and fixed belief not founded on reason and incapable of being removed by reason. [Hall v. Mercantile Trust Co., 332 Mo. 802, l. c. 815, 59 S. W. (2d) 664]. It follows there was no substantial evidence tending to show that Nathan Frank was possessed of insane delusions.

■ II. Plaintiff next contends that there was substantial evidence tending to show that the codicil was the result of the undue influence of Mrs. Hansel. It is not contended that the will was the result of undue influence.

She argued with Mr. Frank that he should make his adopted nieces and nephews equal with his blood nieces and nephews. He had no adopted nieces and nephews, the will did not mention adopted nieces and nephews, and the codicil made no provision for adopted nieces and nephews. She also argued that he should give each of his nephews and nieces $50,000. The codicil contains no such provision. He told her that he would give his chauffeur George Thompson $5000; housekeeper, Ellen Coleman, $2500; former secretary, Mabel Jones, $2500; former secretary, Miss Sutton, $5000; community fund either $3000 or $5000 a year, and she claims to have mentioned a Jewish charity as deserving but did not suggest the amount of, the legacy.

An examination of the will discloses that he gave to Thompson .$1200; Ellen Coleman $1200; Mabel Jones, $1500; Miss Sutton $2500; the community fund $2500 for ten years, and the Jewish charity $5000 for ten years. These bequests were not changed by the codicil. The bequest of $50,000 to Temple Shaare Emeth was made without suggestion from her. Thus it appears that the suggestions of Mrs. Hansel with reference to the above-stated bequests ·were ignored by Mr. Frank.

The contention that she unduly influenced him with reference to the disposition of the residue of his estate is also without merit. She testified that she argued with him to leave his property to relatives rather than to public charities. He did not follow her suggestions, for he excluded the plaintiff. It does not appear that she knew of him. It is certain that she did not attempt to poison the mind of Mr. Frank against his nephew. Furthermore, plaintiff was not mentioned in the will, and it is not claimed that the will

was the result of undue influence. They argued about the nieces and nephews on the one hand and public charities on the other, and finally he agreed to the suggestions. This was not undue influence as defined by this court. [Teckenbrock v. McLaughlin, 209 Mo. 533, 551, 108 S. W. 46.]

The plaintiff had no intimate relations with his uncle, Nathan Frank. He visited with his mother's and stepfather's people in St. Louis and rarely came in contact with his uncle Nathan. There was nothing in common between them. Under the circumstances it was not unnatural for Nathan Frank to omit said nephew from the will and codicil.

III. Plaintiff next contends that the medical experts should have been permitted to give an opinion on the issues of unsound mind, insane delusions and undue influence.

They had never seen Nathan Frank. The hypothetical question submitted to them covers ten pages of the printed abstract. We have ruled that there was no substantial evidence tending to show either unsoundness of mind, insane delusions or undue influence. In this situation there were no facts in evidence upon which to found the opinion of an expert on the question. In other words, said opinion also would not have been substantial evidence tending to prove the issues. [Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S. W. (2d) 664, 672; Berry et al. v. Safe Deposit & Trust Co., 96 Md. 45, 53 Atl. 720, 721.]

It follows that the judgment should be affirmed. It is so ordered. All concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.