AMELIA REX and CHESTER WALKENHORST v. MASONIC HOME OF MISSOURI, a Corporation, THE TRUST COMPANY OF ST. LOUIS COUNTY, a Corporation, EARL KNICKMEYER, IRENE FLYNN, GUSTAV WALKENHORST, HENRY WALKENHORST, WILLIAM WALKENHORST, JULIA KNICKMEYER, MAMIE KNICKMEYER, N. C., by EARL KNICKMEYER, Guardian of Her Person and Estate, EMMA CULLER, EVANGELINE DURNING, VIOLA ZEMBLAGE and WILLIAM WALKENHORST, Defendants, MASONIC HOME OF MISSOURI, Appellant.—108 S. W. (2d) 72.

Division One, July 30, 1937.

*William S. Campbell* and *Watts & Gentry* for Masonic Home of Missouri.

*Schweitzer & Drucker* for Amelia Rex; *Eagleton, Henwood & Waechter* for Chester Walkenhorst; *Foristel, Muld, Blair & Habenicht, Thomas Carlos, Harvey B. Cox* and *Walter Wehrle* for Irene Flynn, Gustav Walkenhorst, Henry Walkenhorst, William Walkenhorst, Julia Knickmeyer and Viola Zemblage; *John E. Corvey* and *Cullen, Fauntleroy & Edwards* for Evangeline Durning.

FERGUSON, C.—This action was brought and tried in the Circuit Court of St. Louis County contesting the will of Mary Huthmaker theretofore admitted to probate in that county. Mary Huthmaker was eighty-one years of age at the time of her death, June 18, 1932, and eighty years of age at the time she executed the contested instrument as her last will and testament. Her husband Peter Huthmaker died in 1925. No children were born of the marriage, Mrs. Huthmaker never remarried, and died without descendants leaving as her heirs at law her collateral kin, one brother, three nephews, seven nieces and one grandnephew; all are parties to this action.

The will, executed under date of October 20, 1931, directed: (1) the payment of her "just debts and expenses of last illness and funeral;" (2) a legacy of $3000 to her grandnephew, Earl Knickmeyer (one of the proponents); (3) a legacy of $1000 to her niece, Irene Flynn (a contestant); (4) a legacy of $1000 to her brother, Gustav Walkenhorst (a contestant); (5) that all the residue and remainder of her estate go to the Masonic Home of Missouri, a corporation (one of the proponents); and (6) that the Trust Company of St. Louis County (one of the Proponents) be executor. All the collateral kin above mentioned except one niece Mamie Knickmeyer, mother of the legatee Earl Knickmeyer, and a niece Emma Culler, joined as contestants. The niece Emma Culler, named as a defendant, did not file an answer. The niece Mamie Knickmeyer, her son Earl, the Masonic Home of Missouri, a corporation, and Trust Company of St. Louis County, named as defendants, joined as proponents. The parties will therefore be referred to as contestants and proponents. Contestants allege: (1) testamentary incapacity of Mary Huthmaker; and (2) undue influence by "the agents, servants and representatives of the Masonic Home of Missouri." The cause was submitted to the jury on the issue of testamentary capacity alone. The jury found against the will. From the judgment, entered on the verdict, adjudging that the contested "instrument in writing is not the last will and testament of Mary Huthmaker," proponent Masonic Home of Missouri has appealed. Mrs. Huthmaker's estate was appraised at more than $38,000, composed as follows: notes secured by first mortgages on real estate, $6390; Bonds and coupons, $9960; Cash, $7699; and eighteen separate parcels of real estate, appraised at various values from $300 to $1540, and aggregating $14,330. Debts, if any, were comparatively small. It is apparent that we have jurisdiction of the appeal.

Proponents made a prima facie case of due and formal execution of the will and that at the time Mrs. Huthmaker possessed the requisite testamentary capacity and was of sound mind. Contestants then offered the evidence upon which they relied to sustain the two grounds of contest alleged which was followed by further evidence on the part of the proponents. At the close of all the evidence proponents, contending that there was no substantial evidence to sustain either ground of contest, timely and in proper form requested the trial court to give a peremptory instruction to the jury to find for them, on both grounds, and to establish the will, which the trial court refused to do. This action of the trial court is here assigned as error.

On the threshold of our review and examination of the evidence, comprising the testimony of seventy-four witnesses, several documents and numerous exhibits making a voluminous record, it

may be well to recall as a primary consideration that, "the law gives one possessed of mental capacity the right to dispose of his property according to his own way of thinking, and it is not for courts or juries to make a will for him." [Major v. Kidd, 261 Mo. 607, 617, 170 S. W. 879, 881.] Therefore in a situation such as that before us the court will examine the evidence with diligence and care to determine whether there is substantial evidence upon either undue influence or testamentary incapacity. "Especially is this true of mental incapacity, for the reason that the opinions of lay witnesses (as in this case) often furnish the basis for the verdict" and we look closely to the facts detailed by such witnesses as the basis for the opinion. [Major v. Kidd, supra.]

Before summarizing the evidence upon which contestants rely as showing testamentary incapacity we first give a general outline of Mrs. Huthmaker's history derived from the uncontradicted evidence. Little appears as to her early life. Her maiden name was Walkenhorst. In her young womanhood she married Peter Huthmaker who owned two meat markets in St. Louis. He gave his personal attention to the one in Union Market and his wife had charge of the other on Cass Avenue. They operated these two markets in this way for about seven years. They then disposed of the markets and purchased a tract of land of more than eighty acres, the full acreage is not stated, at the edge of Kirkwood. This seems to have been somewhere between 1875 and 1880. They farmed this land until about two years prior to Peter's death. Mrs. Huthmaker worked at manual labor with her husband in the fields and about the outdoor work of the farm. Together they cut their fire wood from timber on their land. Their dwelling was a two-story, thirteen-room frame house in a large blue grass lawn. Numerous large, old trees shaded the lawn and the house. Mrs. Huthmaker took great pride in this lawn and personally attended to its upkeep, mowing the lawn with a lawn mower as late as the summer before her death. She was very fond of flowers and was much interested in her flower gardens. Mrs. Huthmaker was a strong, vigorous woman and seems to have had but little illness. She and her husband were industrious and frugal. They saved money and made investments. Some time, apparently many years, prior to Peter Huthmaker's death Mrs. Huthmaker's spinster sister, Mina Walkenhorst, who was, as the writer recalls, some six or seven years younger than Mrs. Huthmaker, came to make her home with them. She did much of the housework and continued to live in Mrs. Huthmaker's home until her (Mina's) death in March, 1931. Mina had no property or income and was wholly dependent upon her sister for support. About the time they ceased active farming operations the Huthmakers had some of their land along the north and east side of the main tract platted as lots fronting on streets and sold lots from time to time. Upon the death of her husband in 1925 all their

property, real and personal, which apparently was owned by the entirety, passed to Mrs. Huthmaker. After her husband's death Mrs. Huthmaker continued to live, with her sister Mina, in the big frame house. She personally and successfully managed her large property interests, acting largely upon her own judgment, looked after the investments and made new investments, and made profitable real estate deals. She sold several of the lots in 1925. Mrs. Huthmaker had George Engel, the deputy county clerk, prepare all of her deeds and take her acknowledgment. He was a witness for proponents and gave an opinion that she was, throughout the period of his long acquaintance with her, of sound mind. Though she did not undertake to carry on farming operations she continued to do physical labor about her home, working about the lawn and her flowers, raising chickens and milking the one cow she retained. For some years next preceding the date of the contested will and until her death she did her banking business at the First National Bank of Clayton of which Walter D. Lindeman, one of the witnesses to the contested will, was president. She had a safety deposit box at the bank in which she kept her bonds, notes and mortgages, etc. Through this bank she bought notes secured by first deeds of trust on real estate and consulted with Mr. Lindeman about such investments as well as other investments. Frequent reference is found in the evidence to the fact that, at all times, she maintained an active and lively interest in local real estate transactions and was well informed as to real estate values. No indication appears in the evidence that the real estate notes she from time to time purchased were not well and amply secured or that she made any reckless or doubtful investments. It cannot be doubted that she understood and kept her business affairs well in hand. We digress here to observe that contestants did not produce any person with whom Mrs. Huthmaker had business transactions, or who knew anything about her business affairs, to give an opinion that she was of unsound mind or lacking in capacity to manage her property. On the contrary numerous persons with whom she had business transactions, or who were consulted by her and were familiar with her affairs, testified, on the part of proponents, that she was a shrewd, capable, business woman of sound business judgment. Mrs. Huthmaker was not given to visiting her relatives, now parties to this action, and seemed to have had little interest in, or affection for, them. Though Mrs. Huthmaker came of a Lutheran family and in childhood had been confirmed in that faith, she did not, from the time the evidence herein takes up the course of her life, attend church or manifest an interest in any religious organization, and, so far as directly appears, it was not until she made her first will in May, 1930, that she evidenced an interest in any charitable organization. Two sisters, the Misses Hazel and Helen Evans,

bought a lot from the Huthmakers in 1920. This lot was across Forrest Avenue from the Huthmaker home and after purchasing the lot they lived at the Huthmaker home until their residence on this lot was constructed. The Evans ladies were employed in St. Louis. They and Mrs. Huthmaker were very close friends. They saw her almost daily. We insert here the comment that these ladies, as witnesses for proponents, depicted Mrs. Huthmaker as a fine neighbor and friend and a person of sound mind and judgment throughout the twelve years of their close and intimate acquaintance.

In May, 1930, Mrs. Huthmaker told Miss Hazel Evans; that she was going to make a will; that she wanted her sister Mina taken care of; that Mina had no business experience and she intended to put her property in trust for the benefit of Mina during Mina's life; that after Mina's death she wanted the property "used for some good purpose;" and she asked Miss Evans to compile "a list of old folks' and orphans' homes . . . for her." Later in the month (May, 1930), at Mrs. Huthmaker's request, Miss Hazel Evans drove her, in the Evans' automobile, to the Mississippi Valley Trust Company in St. Louis where, while Miss Evans waited on the outside and later took her home, Mrs. Huthmaker had a will prepared which she executed and left in the care of the trust company. This will put all of her property in trust for the benefit of Mina, the income to be used for Mina's support as long as she lived, the trust company was made trustee and executor, the trustee was given authority to encroach upon the principal of the trust estate, if necessary in its discretion, to provide proper support for Mina, and upon the death of Mina the trust was to terminate and all the property go in equal shares to the following charitable institutions or organizations; St. Louis Altenheim, Lutheran Orphans' Home, Lutheran Childrens' Society of Missouri, and the Old Folks Home at Kirkwood. She selected these institutions from the list compiled for her by Miss Evans. It will be noted that by this will executed in May, 1930, she made no provision for any of her kin except Mina, none of her other relatives, parties to this action, were included.

Mrs. Huthmaker and Mina lived at the Huthmaker home alone. The large, two-story frame house, of thirteen rooms was in a "run down condition." The only repairs made in recent years was a new roof. It had no furnace, water, toilet or conveniences of any kind except electric lights. Water was carried from a pump in the yard. Heat was supplied by wood burning stoves. In the winter of 1930 Mina was in failing health and in December became ill. The weather was bad and Mrs. Huthmaker herself was ailing. Sometime the latter part of December, Dr. Hansen, arranged for both ladies to go to the home of their niece Mrs. Amelia Rex (one of the contestants) in the city of St. Louis. Mrs. Rex had a comfortable

home, of nine rooms, with furnace heat and all modern conveniences. They remained at the Rex home until February 8, 1931, when they returned to the Huthmaker home and Mrs. Huthmaker arranged with a Mrs. Goodloe to come there and assist in caring for Mina and in the housework. Mrs. Goodloe went to the Huthmaker home on February 9th and stayed until May 1st (1931). Mina died March 15, 1931. Mrs. Huthmaker lived alone at her home during most of the summer of 1931. Mrs. Goodloe describes her, as being, at that time, an active, "wiry" woman. She did her own housework, and worked about the lawn and cared for her flowers. Her brother Gustav Walkenhorst (one of the contestants), to whom she bequeathed $1000, says he went out to her home "about twice a month" and "off and on" for "three years" next before her death and did some work for her about the place.

Otto Flaesche contracted to purchase a lot from Mr. and Mrs. Huth-maker and made the "down payment" in 1924. He completed his payments after Mr. Huthmaker's death and Mrs. Huthmaker made the deed. Flaesche built a residence on the lot. In June, 1931, he was negotiating for the sale of this property. The prospective purchaser conditioned the purchase upon Flaesche obtaining an adjoining lot and conveying the two lots. Flaesche entered into negotiations with Mrs. Huthmaker to purchase the adjoining lot. She asked $1000. Flaesche offered her $700. Mrs. Huthmaker countered with a price of $800 and said she would "not take a cent less" and the sale was finally consummated at that price. In July (1931) Mrs. Huthmaker had a brief sick spell, a slight and passing digestive disturbance caused "by something she had eaten," otherwise her general health was good.

Mrs. Huthmaker's cash income was derived from interest collected on the notes secured by first mortgages on real estate and the bonds which she owned, the principal of such notes and bonds aggregating approximately $16,000, and cash received from the occasional lot sales. She was deriving no income whatever from the 80 acres of farm land. The total annual taxes on this land alone was in excess of $600. During 1930 and 1931 she stated to various friends, at different times, that she would like to dispose of this farm land and "move where it was more convenient," that she was deriving no income from the farm land and "the taxes were getting higher and higher," and "eating into the income" from her income producing investments. Illustrative of her attitude is a conversation in 1931 with Mr. Kinyon, the then mayor of Kirkwood, whose acquaintance with her extended over a period of forty years. They were discussing her real estate holdings. She said she had "quite a place there but there wasn't sufficient income from it to pay the taxes." Kinyon asked why she did not "get some relatives to come" and live on the farm.

She replied that "she had no relatives she cared to have there" except her grandnephew, Earl Knickmeyer (given a legacy of $3000 and one of the proponents) of whom she seems to have been particularly fond. She said he was employed in the city and had a family "and it would be a burden upon him to come there and make a daily trip back and forth to the city." In September, 1930, she placed the sale of the farm land, under a contract, with the Mississippi Valley Trust Company in St. Louis. In October, 1930, L. T. Rambo a real estate agent in Kirkwood hearing that Mrs. Huthmaker, desired to sell the property went to see her seeking the agency to handle it. She negotiated with Rambo, told him of her prior arrangement with the trust company, finally went to the trust company and obtained a release, and then placed the property with Rambo.

By 1930 the Masonic Home in St. Louis, maintained by that fraternity as a home for orphan children and homeless old folks, was crowded to capacity in providing a home for approximately 500 such persons. At the Grand Lodge meeting in September of that year tentative plans for either constructing additions to the buildings in St. Louis or securing a site outside of but near St. Louis were discussed. The information that the Masonic Home contemplated the possible acquisition of a tract of land near St. Louis came to real estate agents. A number of tracts were submitted but for various reasons, either price or location or other conditions, none were acceptable. Rambo commenced calling on Mr. Martin, president of the Masonic Home, in February, 1931, seeking to interest the Home in the Huthmaker land and though Martin told him from the first that on account of the price asked and other considerations the Home was not interested in the land, Rambo continued calling at Martin's office. Finally in June Martin told Rambo "positively" the Home could not consider the land and requested Rambo not to call on him further about the matter. Rambo then told Martin that Mrs. Huthmaker wanted, "was very anxious for," the Masons to have the land as a site for an old folks' and orphans' home. Martin replied that, "if she is interested in us having it why don't she give it to us." Rambo said he thought Mrs. Huthmaker would be glad to do that on some kind of an annuity basis. Within a few days Rambo returned and said Mrs. Huthmaker "would be happy" to convey the eighty acres of land to the Home if they would build her a home on a small tract on Forrest Avenue and pay her an annuity of $5000, in monthly installments. Rambo stated however that Mrs. Huthmaker would not pay him any commission on that kind of an arrangement and required that he look to the Home for the commission. Martin agreed to submit the matter to the board of directors and told Rambo that if the proposition was accepted and completed he would recommend that the Home pay a commission on the basis of

five per cent on a valuation of $80,000 or $4000. The board of directors of the Home next met July 8 (1931). Mrs. Huthmaker's, offer was discussed and the members of the board went to the Huthmaker home to view the property. Mrs. Huthmaker showed them the property, took them to an observation platform atop the house from which they could view the surrounding area, pointed out the boundaries, and reiterated her desire to give the property to the Home for the use of the old folks and orphans in its care. Following this visit the board of directors resumed their meeting at the Home and authorized a committee of its number to enter into a ninety-day option contract with Mrs. Huthmaker. Shortly thereafter such contract was prepared. It provided, that Mrs. Huthmaker convey the eighty acres of land to the Masonic Home; that during the remainder of her life the Home should pay an annuity of $5000, in monthly installments of $416.67; That the property should be used for the purposes of the Home as set forth in its Articles of Incorporation; that the real estate, and buildings erected thereon, should be known and designated as "Mary Huthmaker Memorial" and that a tablet commemorating the gift and as a memorial to Mrs. Huthmaker be placed at a suitable place on the premises; that Mrs. Huthmaker convey to the Home an additional tract containing approximately three acres, reserving a life estate therein; that the Masonic Home would erect a residence on this tract, within a specified time, at a cost not to exceed $5000 for the use of Mrs. Huthmaker, without any rental charge, "during the remainder" of her life and that the Home would keep taxes of every kind thereon paid; that the deeds conveying the real estate and the contract, when executed, be placed in escrow; that $200 to be placed in escrow by the Home, at the same time, be paid to Mrs. Huthmaker if the Home did not accept the terms of the contract and the conveyances within ninety-days from the signing of the contract; and if so accepted the $200 was to be applied upon the first monthly installment of $416.67.

Early in July (1931), Mrs. Huthmaker went to the First National Bank at Clayton to see Mr. Lindeman, whom we have heretofore mentioned, and told him she had a deal pending with the Masonic Home for her land, that she wanted him to look after her interests, that a contract would be prepared, and as soon as she received a copy of the contract she would bring it to him for his consideration and advice. Later in July, upon receipt of a draft of the contract and the deeds, Mrs. Huthmaker took them to Mr. Lindeman. They discussed the terms generally and specifically the monthly income provided by the contract and the income from her bonds and notes and what her gross annual income would be. She objected to the cost price of the residence limited by the contract to $5000 saying that would not build the kind of house she wanted. Mr. Lindeman

called a Mr. Barnes, a lawyer in the title department of the St. Louis County Trust Company, into consultation. Barnes thought the land descriptions in the contract and deeds were not sufficiently definite and he agreed to prepare definite and correct descriptions. She called on Mr. Lindeman "several times" during July and discussed the contract with him "privately." Sometime in July, Martin met with Mrs. Huthmaker, Lindeman, and Barnes, and agreed to Mrs. Huthmaker's request that the cost of the residence be raised from $5000 to $10,000 and certain other changes in the verbiage of the contract and deeds were agreed upon. Barnes rewrote the contract and the deeds making these corrections and inserting the land descriptions as compiled by him. The terms of the contract as rewritten were substantially the same as the original contract except the maximum cost price of the residence was fixed at $10,000. Mrs. Huthmaker, Lindeman, Barnes, Rambo and Martin met at the bank on August 6, 1931, the contract and deeds were read, Mrs. Huthmaker said they contained "all the requirements" and she was "perfectly satisfied," they were then executed and placed in escrow with the bank. We have gone into detail in this matter as we think the evidence shows that Mrs. Huthmaker fully understood and comprehended all the details of this transaction, about which contestants make much ado, and well knew what she was doing. On September 28, during the 1931 annual meeting of the Grand Lodge, the board of directors of the Home voted acceptance and appointed a committee with authority to carry out the terms of the contract. The board also authorized the payment of $4000 commission to Rambo, which was made. It will be noted that Mrs. Huthmaker did not convey, but retained title to, the lots, twenty-one in number, eighteen of which she owned at the time of her death. On the morning of September 29, the children of the Home were taken to the meeting place of Grand Lodge where they gave a short entertainment. Mrs. Huthmaker went to the Home that morning and accompanied the children, and those in charge, to this meeting. At the conclusion of the children's program the Grand Master introduced her, from the platform, to the members of the Grand Lodge and announced her gift to the Home. We neglected to mention that she had previously visited the Home in July and had dinner there.

As further confirming that Mrs. Huthmaker comprehended this transaction, and did what she desired to do, are statements she made to friends at various times mostly during July (1931) while the matter was pending. Mrs. Heising, a friend of long standing, visited Mrs. Huthmaker at her home the evening of July 4. They sat on the lawn and chatted for sometime. On that occasion Mrs. Huthmaker told Mrs. Heising that, "I am going to give my place to the Masons for an orphanage" and that the "Masonic order" was going to build her "a

bungalow" for her to use as long as she lived. During that month she told Engle the terms of the transaction. Late in July Mr. and Mrs. Barlow, long neighbors and friends, visited Mrs. Huthmaker. In the course of the conversation she told them she was "about to deed her property to a charitable institution" and that it would be made public soon. In August (1931) Mr. and Mrs. Koch, elderly folks and neighbors to Mrs. Huthmaker for twenty-five years, were visiting with her. She told them she "thought she was going to give her farm to the Masonic order for the purpose of building a children's home and that the Masons would build her a house and take care of her as long as she lived." She told Mrs. Michelson, a neighbor, about the first of August, that "she was giving her land to the Masonic Home."

Though the contract with the Masonic Home provided that Mrs. Huthmaker should have the use of the old home until the new residence they were to build for her was completed she decided late in September (1931) that she would like to board until she could get into her new home. She asked Rambo if he and his wife would board her. They agreed to do so and she went to their home paying an agreed monthly sum for room and meals.

In the early part of October Mrs. Huthmaker went to the bank and told Mr. Lindeman she wanted to see about making a will, that "she had a will at the Mississippi Valley Trust Company but she wanted to cancel that and make a new one." He took her to Mr. Barnes, the lawyer heretofore mentioned, connected with the trust company in the same building, and told Barnes, "Mrs. Huthmaker would like to talk to him about making her will." Barnes asked her if she had a "memorandum of just what she wanted" and had she decided "just how she wanted to dispose of her property." She replied: "Well, not altogether" and that she would "come over later."

On October 10 (1931), Mrs. Huthmaker sold and conveyed two of the lots to her grandnephew, Earl Knickmeyer and his wife, at a price of $1400. The grantees executed notes for the purchase price payable in monthly installments and secured by a first deed of trust. As usual Engel prepared the various instruments and took the acknowledgments. Such of these notes as remained unpaid were included in the estate.

On October 15 (1931), Mrs. Huthmaker went to the Mississippi Valley Trust Company, withdrew the will she had executed and deposited there in May, 1930, and destroyed it. On October 20 (1931), she went to Barnes' office and told him she "wanted him to fix up that will." She had a memorandum of the intended beneficiaries and "what she wanted to do." Barnes relates the facts surrounding the preparation of the will, which is the instrument in contest, as follows: "I got my information for the will from the memorandum

that she had with her and the conversation with her. I asked her if she had any children or direct descendants, and she said, 'No.' She mentioned a brother and nephew as designated. I made a rough draft for my stenographer to copy. I asked her if there was anything that she had overlooked or forgotten or whether she had put anything in that she probably should not and I tested her memory if she might possibly have overlooked anyone. It was just a general conversation between me and her relative to the objects of her bounty and those who should be cared for by her. She did not tell me that the three mentioned (in the will) were the only relatives that she had. I think she said she had other relatives but these were all she cared to provide for." The will was then written in final form. Barnes "read it over to her," she declared it was satisfactory and Barnes then called Lindeman, asked him to be a witness and to bring another qualified person to act in that capacity. Lindeman and Edward Eble, cashier of the bank, who had been acquainted with Mrs. Huthmaker for seven years and had theretofore had frequent banking transactions with her, responded to Barnes' request. Barnes says he propounded certain questions in response to which Mrs. Huthmaker declared to Lindeman and Eble that the instrument was her "last will and testament" and requested them to sign as witnesses. Thereupon Mrs. Huthmaker signed the will in the presence of the witnesses and Lindeman and Eble signed as witnesses in her presence and the presence of each other. Mr. Eble then returned to his office and Mrs. Huthmaker asked Lindeman to read the will. Lindeman says that he and Mrs. Huthmaker then "read the will," "went over it together in the presence of Mr. Barnes" and that she declared that she was "perfectly satisfied." Eble stated: "Based on all my acquaintance with her both prior to, and on the day when she signed that instrument, my opinion is that her mind was absolutely sound." Lindeman said: "Based on an acquaintance of more than fifteen years, the business transactions I had with her and the conversations, including my conversation with her on that day and my observation of her that day, I am satisfied that when she signed the instrument she was of sound mind." Barnes testified that, "from conversations with her, my observation of her demeanor . . . and conduct . . . and what she said and did on the occasions when I saw her, in my opinion her mental condition was of the best. She knew what she wanted in relation to the will and realized the condition of her estate."

In October the architect employed by the Masonic Home to prepare plans and supervise the building of the brick residence for Mrs. Huthmaker called on her at the Rambo home. He submitted preliminary sketches and she made several suggestions, requested her bedroom be made larger, changes as to size of other rooms, etc.

Sketches were revised and after several conferences with her during November and December the plans were put in final form. The residence was to be an attractive, roomy, house with all modern conveniences including an air cooling system.

The following occurred December 19 (1931). Mrs. Huthmaker regularly appeared for breakfast at the Rambo home between six and six-thirty. On that morning she did not appear at the customary time. Mr. Rambo went to her room, found her fully dressed, sitting on the edge of the bed, apparently "in a daze." He spoke to her but she made no response. Seemed not to hear or understand. The Rambos called Dr. Westrup. However, within a few moments, Mrs. Huthmaker revived and seemed fully recovered from the "daze." She was sitting in a chair when the doctor arrived "within a half hour after the call." Dr. Westrup stated, "I would not say she had an apoplectic or a paralytic stroke. There was a disturbance of the cerebral circulation, possibly due to arteriosclerosis or hardening of the arteries" and "I would not think there was any bursting of a blood vessel, because she would not have recovered so quickly." Mrs. Huthmaker had been invited, and had planned, to go to the home of a niece Mrs. Irene Flynn (one of the contestants, the will gives her $1000) in St. Louis for Christmas and to remain there for awhile thereafter. The day following the incident just mentioned she went to Mrs. Flynn's home and remained there until with the advent and lure of spring she went back in April, 1932, to her old farm house to board . . . with a family whom the Home had placed there as caretakers until her new residence, then in the course of construction, was ready for occupancy. As the writer recalls none of the incidents or circumstances related by Mr. or Mrs. Flynn, witnesses for contestants, as tending to show Mrs. Huthmaker was of unsound mind are said to have occurred during the priod from December 20, 1931, to April, 1932, that she was at the Flynn home.

On February 12 (1932), Mrs. Huthmaker met the architect and general contractor at the site of the new residence. The architect and general contractor laid out the lines for the foundation. Mrs. Huthmaker was interested in the lawn space and upon discovering that the front house lines would require the cutting down of a beautiful shade tree, which she had planted many years before, she requested that the house be located further to the south in order to save the tree and that was done. Construction was commenced shortly thereafter. She visited the house three or four times weekly and consulted with the architect, general contractor and subcontractors. These men testified that she took an active and intelligent interest in the work. On Sunday she would go with friends and show them about the house and point out where she intended to arrange

her flower gardens, etc. These frequent visits continued to the very day before she was stricken. Her physical vigor and alertness is illustrated by the fact that "she went everywhere about the building" while it was in construction. Before the "subfloor" was laid she walked over "one by eight" boards "laid across the joists" and she went unassisted into the building over a "2 x 10 plank, 14 feet in length" one end of which rested on the ground and the other in the doorway three and one-half feet above the ground. She expressed a preference for a more costly and different type and color of brick and mortar than that specified by the plans and contract. The Home acceded to her wish and agreed to pay the additional cost. The plans specified black slate shingles for the roof. Mrs. Huthmaker expressed a preference for "ocean green" shingles which were more costly. The Home granted the request agreeing to pay the additional cost. The contractors said her selections of brick, mortar and shingles were in good taste and added to the appearance of the house. She personally selected the electrical fixtures. We have noted these details shown by the evidence, which must be treated as uncontradicted, as tending to show that to the very day she was stricken Mrs. Huthmaker maintained an active, intelligent and competent interest in and understanding of her affairs.

On April 16, 1932, Mrs. Huthmaker closed a pending deal with William Nicholson for one of her lots. Nicholson delivered his check for $2000 and she executed and delivered the deed. At that time Nicholson told her he was interested in "another lot down near where the Evans ladies live" and asked her "what she would take for it." She said she would consider the matter and "let him know" later. In about a week she made him a price of $1800 but "he did not buy." Mrs. Huthmaker stated at that time that, "she did not care whether she sold it or not; if she did not sell it she would give it to the Masons."

On Sunday, May 1 (1932), Mrs. Huthmaker showed friends about her new house. She seemed vigorous and well. On the same day she visited the home of the Misses Evans. On the next morning, May 2 (1932), at about seven-thirty, as the Misses Evans left their home to go to their work Mrs. Huthmaker was in the yard of her old home and waved to them. Later that day she suffered a stroke of apoplexy, "a cerebral hemorrhage," which rendered her unconscious. She was taken to a hospital in St. Louis where she remained totally and continuously unconscious to the date of her death, June 18, 1932.

There are ten contestants. To sustain the charge of testamentary incapacity contestants produced sixteen witnesses, five of whom are contestants, two children of contestants, two husbands of contestants, four lay witnesses who were not related to contestants, one doctor

who had at one time treated Mrs. Huthmaker but gave no opinion, and two doctors, who had never known Mrs. Huthmaker but gave an opinion, as experts, based upon a hypothetical question embracing the testimony of contestants' other witnesses. Contestants' case is not aided by proponents' evidence and we are therefore confined to an examination of the evidence on the part of contestants alone in determining whether there is substantial evidence to support the charge of testamentary incapacity.

Chester Walkenhorst, a nephew, and one of the contestants, testified that in 1927 he had a broken leg. Upon release from the hospital he went to the Huthmaker farm to rest and recuperate; that his aunt was "very stingy with her food;" that she had "spells of temper" and "whenever she lost her temper I thought she was crazy;" that he had observed her working about the lawn, picking up dead twigs and small sticks, which had fallen from the trees, and placing them in piles by a tree and then she would move them from place to place "until she got them where she wanted them." Any significance contestants would attach to this habit, emphasized by another contestant witness, Mrs. Huthmaker's brother, fades when it appears that she would move these small piles and collect them in one pile and then carry the twigs and branches into her kitchen, place them in a large basket at the side of the cook stove and use them for fuel.

Mrs. Rex, niece and a contestant, at whose home in St. Louis Mrs. Huthmaker and Mina stayed from sometime in December, 1930, until February, 1931, when Mina was ill and Mrs. Huthmaker was "ailing," stated that on one occasion during that time Mrs. Huthmaker ate her dinner and "went out and told my son (when or how long after dinner not stated) that she had not had any dinner;" that Mrs. Huthmaker "had no religion;" that "quite a few times she flew into a rage without apparent cause;" that she (Mrs. Rex) on one occasion directed Mrs. Huthmaker and Mina to sit in another room while the maid (a Mrs. Aubuchon, a witness for contestants) cleaned their room and that she heard Mrs. Huthmaker complain to the maid that Mrs. Rex had locked her in the bathroom; and that on one occasion, at dinner, while eating "some potato dumplings" Mrs. Huthmaker said "these carrots are very good."

Mrs. Aubuchon, the maid in the Rex home, was the next witness for contestants. She told of Mrs. Huthmaker saying to her: "They locked me in the bathroom while they cleaned my room." This witness said, that Mrs. Huthmaker was "an awful curious woman . . . she asked me 'You would not take anything in my room, would you;'" that Mrs. Huthmaker, while at the Rex home would hide her pocketbook and change the hiding place and "one time while she was eating a meal, went to the closet took out her pocketbook and opened it and put it back, that was the first time I noticed she

606

was funny;" that, one morning shortly after Christmas (1930), while the decorated Christmas tree was yet in the Rex home, she saw Mrs. Huthmaker take some decorative piece off the Christmas tree, throw it to the floor and step on it; that Mrs. Huthmaker was talking to herself at the time but the only word she understood was "money;" that Mrs. Huthmaker kept a "lot of magazines and newspapers" in her room at the Rex home and told her (Mrs. Aubuchon) that she cut out farm advertisements and that she could "buy land and sell it again" and make money and that she could have her money and bonds buried with her and nobody would get it; and that Mrs. Huthmaker cut some pictures of "bathing beauties" from magazines, showed them to her (Mrs. Aubuchon) and then lifted her dress partly displaying her leg and said, "that is a shapely leg, that is the kind of woman to use bathing suits."

Mrs. Flynn, a niece and a contestant, bequeathed $1000 by the will, never saw Mrs. Huthmaker until 1928. She and her family resided in St. Louis. During the summer of 1928 and subsequent summer periods the Flynn family made frequent visits to the Huthmaker home on outings or picnics. Mrs. Flynn said, that she saw nothing unusual about her aunt's conduct in 1928 or 1929; that when Mina was ill in December, 1930, she stayed at the Huthmaker home two days; that one morning she prepared the breakfast; that Mrs. Huthmaker said "she didn't want anything but a cup of coffee;" that "I fixed myself three eggs" and several pieces of toast and placed them on the table at which Mrs. Huthmaker was seated; that Mrs. Huthmaker took some of the eggs and toast on her plate and ate them and "I had to fix myself some more."

Dorothy Flynn, the eighteen year old daughter of Mrs. Flynn testified, that while Mrs. Huthmaker was in the Flynn home, from December 20, 1931, to April, 1932, an elderly gentleman, a Mr. Angel, called on Mrs. Huthmaker several times, took her to the automobile show once and on that occasion told Mrs. Huthmaker "she ought to put some rouge on and later she bought some rouge;" that at another time just before Christmas, 1931, Mr. Angel "kissed her on both cheeks" when he came in; that while Mrs. Huthmaker was in the Flynn home "she sewed a lot, that is about all she did," and "she went to bed early." On the facts stated the witness gave it as her opinion that Mrs. Huthmaker was of unsound mind when she made the will.

The testimony of John Durning, husband of contestant Evangeline Durning, a niece, who did not herself testify, is so lacking in probative value that we notice it only as being illustrative of slight incidents in the evidence, not mentioned, from which contestants would have us draw farfetched inferences. Durning had not seen Mrs. Huthmaker from 1917 until the summer of 1930. He says he

was at her home that summer and that in conversation she would "start talking on one subject and leave that and talk about another one;" that once Mrs. Huthmaker went out to feed the chickens and he accompanied her; that there was a barrel in the corner of a small implement house which had a little chicken feed in the bottom; that he stood at the door while she went into this house and to the barrel; that he heard "a bump" and asked her what was the matter and she said there was a rat in the barrel;" that he went over to the barrel, shook it, and "didn't see a rat or any hole in the barrel." He says he attended Mina's funeral, in March, 1931, and Mrs. Huthmaker asked him if he didn't think Mina looked like a sixteen year old girl.

Dr. Hansen testified that he had known Mrs. Huthmaker for twelve or fourteen years, had treated her at times; and that "she had evidently been a healthy woman" and was not inclined to heed his advice as much as she should; and that she had "what we call hardening of the arteries, arteriosclerosis." He said "every one I have worked on has been off at times" and he had no opinion as to Mrs. Huthmaker's mental condition.

Mrs. Goodloe, whom Mrs. Huthmaker employed during Mina's last illness and who stayed at the Huthmaker home from February 9, to May 1, 1931, gave an opinion that Mrs. Huthmaker was of unsound mind on October 20, thereafter when she made the will. Her opinion was based upon these matters detailed in the testimony; that the house was "very dirty" when she went there; that Mrs. Huthmaker "wasn't a housekeeper," "she was peculiar," "she wouldn't let me have full run of things;" that "she would not let me burn two lights," the ceiling light and floor light, at the same time; that she often discussed religion with Mrs. Huthmaker and Mrs. Huthmaker said, "she did not believe in God; that one day a big caterpillar tractor, a "big monstrous digging machine" started across Mrs. Huthmaker's land; that Mrs. Huthmaker was "mad" and "excited because they came on her land without permission" and "went down and talked" to the men in charge and they agreed that if she would permit them to continue across her land they would pay her $10 and later sent her a check therefor; that she (the witness) "didn't think it was very nice of a woman who had as much money as Mrs. Huthmaker had" to charge for the tractor and machine crossing her land; that while Mrs. Huthmaker "would buy enough to supply the table" she would not let her (Mrs. Goodloe) cook as much as she thought necessary; and that along in April, "when the weather got warm," Mrs. Huthmaker would put meat in a bucket and hang the bucket in the cistern and sometimes left the meat there so long "you could not cook it any more." Though the witness gave an opinion as above noted she stated on cross-examina-

tion that Mrs. Huthmaker "had a mind of her own and positively knew what she was doing and when she made up her mind to do a thing she came pretty near to doing it. She went after a good deal always."

The testimony of Miss Pearl Pallady who said she had lived neighbor to Mrs. Huthmaker for twenty years is so inconsequental as to contribute nothing of probative value; that Mrs. Huthmaker "was not clean;" that she was "queer because she dressed in a man's coat, hat and shoes;" and she would "fly off." It developed that Mrs. Huthmaker frequently wore a man's sweater coat and perhaps a man's hat when working outdoors. This witness's conclusion on such facts was that Mrs. Huthmaker "was always of unsound mind to a certain extent."

Lizzie Huthmaker, a spinster sister of Mrs. Mary Huthmaker's deceased husband, was produced by contestants as a witness. She stated that in her opinion Mrs. Huthmaker was of unsound mind since 1929. She had not seen Mrs. Huthmaker since attending Mina's funeral, in March, 1931. The witness lived in St. Louis. It clearly appears that she had no intimate knowledge of Mrs. Huthmaker or her affairs. Her opinion was based wholly upon the following: that in 1929 Mrs. Huthmaker was ill and she went "out to see her;" that when she went into the room where Mrs. Huthmaker was confined to her bed, Mrs. Huthmaker said, "you were here yesterday" but she had not been there the day before; that she (the witness) then asked Mrs. Huthmaker if she had had a doctor and Mrs. Huthmaker said a doctor had been to see her and he said she had a "high fever" and added: "Do you know what he said to me? He said, 'we are getting old' and I told him, 'I am as young as anybody, I can outwork any of the women around here;'" that at Mina's funeral Mrs. Huthmaker remarked to her: "It's a good thing Mina died before I did because Mina could not take her part in the world, I can, I am a fighter."

The contesting brother Gustav Walkenhorst (bequeathed $1000) testified that he worked at the Huthmaker home "off and on" for three years preceding her death, "was out there about twice a month;" that at some time not stated he built a fence for Mrs. Huthmaker and that after it was finished she wanted it torn down, why is not stated, but he did not do so; that he had heard her hammer against the window sill, at night, with a piece of board after he had gone to bed, whether this occurred more than once and the occasion for her action is not stated; that she did not serve ample meals, was stingy about food; that he had gone to her home, she would be in the yard, upon his approach she went into the house and locked the door but after a short time came out of the house and recognized him. Whether this was a frequent occurrence or a

single and isolated instance and the surrounding circumstances not being stated this item of testimony is too vague and conjectural to warrant the kind of inference contestants would make. On its face it shows nothing more than that she did not recognize him as he approached.

Mrs. Julia Knickmeyer, niece and contestant, saw Mrs. Huthmaker infrequently and but once after Mina's death. She stated that after 1929 she had at times noticed that while engaged in conversation Mrs. Huthmaker would change the subject; that she had walked with Mrs. Huthmaker about her farm and that Mrs. Huthmaker had been confused about the unfastening and fastening of a certain gate, and would "fuss" about it; that she had seen her become very angry when the witness thought there was no occasion for an outburst of anger; that the witness attended Mina's funeral and Mrs. Huthmaker, while standing near the casket, remarked to her, "she (the deceased) looks nice, doesn't she? She is my daughter." This last statement ascribed to Mrs. Huthmaker is inexplicable in the light of contestants' own evidence. Most of contestants' lay witnesses were present at this funeral. No other person heard such a remark and there is no evidence reasonably susceptible of the interpretation that, at that time, Mrs. Huthmaker acted in any unusual manner or that a mental lapse of any kind was indicated, nor does this witness relate any other circumstance or any other thing said or done or about Mrs. Huthmaker's appearance indicating a mental lapse. However the witness understood the remark, in view of the relationship existing over a long period of years, as we have heretofore related, is it not more reasonable to assume that Mrs. Huthmaker said, "She is like my daughter" or "she is like a daughter to me." Mrs. Huthmaker made all the arrangements for the funeral and the undertaker and the Lutheran clergyman who conducted the funeral, and who had conducted her husband's funeral, testified for proponents.

William Edward Flynn, husband of contestant Irene Flynn, testified that on visits with his wife to Mrs. Huthmaker's home he had noticed that Mrs. Huthmaker would sometimes change the subject of her conversation and that while engaged in conversation he had seen her get up from her chair "as if she were going somewhere," walk about the room, and then resume her chair, continuing the conversation during the time. He stated that on one occasion Mrs. Huthmaker said: "I am a Prussian, I am going to be a Prussian to the Masons, too;" that he asked her what she meant and she replied: "That is Red Cross in German, that is what I will be with the Masons." Apparently the witness's memory of the purported statement is vague and resulted in a garbled version. It must be remembered that Mrs. Huthmaker was not an educated

woman and that her mode of expression was somewhat limited. Evidently she was endeavoring to convey the thought that her aid to the charitable work of the Masonic fraternity was in the spirit of the Red Cross or that such spirit characterized her attitude toward the Masons.

We have consolidated the testimony of certain of the foregoing witnesses concerning the attitude of Mrs. Huthmaker toward Mina during the time Mina was ill. The first incidents relate to the period of several weeks that Mina and Mrs. Huthmaker were at the Rex home. Chester Walkenhorst stated that on one occasion during that period he visited the Rex home and mentioned Mina's illness to Mrs. Huthmaker and that Mrs. Huthmaker "shook" Mina, who was asleep, and said, "she is only putting on." Mrs. Rex said Mrs. Huthmaker insisted upon Mina eating when Mina was not hungry and even at times when Mina had just finished a meal. Mrs. Aubuchon, who, as we have mentioned worked at the Rex home, testified that Mrs. Huthmaker told her that, "she didn't see that anything was the matter with Mina and that there was nothing wrong with Mrs. Rex either, she was just putting on and wanted somebody waiting on her." The witness said that Mrs. Rex was at the time in "poor health." Mrs. Aubuchon further testified, that Mrs. Huthmaker insisted upon Mina trying to walk; and that she "would pound Mina on the back with her fists." On further examination this last statement was explained by the witness. Mrs. Huthmaker insisted at some time, or times, that Mina take a digestive tablet. It seems Mina had difficulty in swallowing the tablet and "choked," thereupon Mrs. Huthmaker "pounded her, on the back" as the witness stated it. Apparently the witness did the same thing for in relating how Mrs. Huthmaker insisted on Mina taking these digestive tablets. (whether prescribed by the attending physician does not appear, presumably so) and Mina's difficulty in swallowing them, the witness says "Mina would choke and we would have to raise her up and pound her on the back and give her water." Mrs. Goodloe said that during Mina's illness at the Huthmaker home she heard Mrs. Huthmaker tell Mina she wasn't sick and that when Dr. Westrup said Mina "was very sick" and wanted to send her to a hospital Mrs. Huthmaker said she "would not hear of having Mina sent to a hospital."

The witnesses, Chester Walkenhorst, Mrs. Rex, Mrs. Aubuchon, Mrs. Flynn and Gustav Walkenhorst, testified that they had heard Mrs. Huthmaker "talk to herself," "mumbling to herself," but she spoke in a low tone and they did not understand what she was saying at such times. In reply to a question hypothesizing the testimony of the foregoing witnesses Drs. Deppe and Barnes, having qualified

as experts, gave opinions that Mrs. Huthmaker was of unsound mind. Neither had known or ever seen Mrs. Huthmaker.

While this inquiry has naught to do with the weight of the evidence or proponents' countervailing evidence it is interesting to note that proponents had as witnesses eighteen neighbors of Mrs. Huthmaker. The homes of many of them adjoined the Huthmaker land, several had purchased their home site from the Huthmakers or Mrs. Huthmaker after her husband's death. These neighbors had known Mrs. Huthmaker intimately and well for long periods of time, from seven to forty years. Proponents also had as witnesses twelve other citizens of Kirkwood, officials, business men who had business transactions with her, and others, all men and women of high standing in the community, who had been well acquainted with Mrs. Huthmaker. None of these disinterested witnesses had noted any of the peculiarities or traits related by contestants and their witnesses. On the contrary they said she was an active, vigorous woman physically, of good disposition, a good neighbor, a shrewd, capable business woman, and with one accord declared her of sound mind.

We first consider the attitude of Mrs. Huthmaker toward her sister during Mina's illness, as shown by contestants' evidence, Mrs. Huthmaker had herself been a strong, healthy woman. Even during the last years of her life she had very little illness, two or three slight attacks of short duration. She had had very little experience with sick people. She may have sincerely but mistakenly believed her sister was not ill, or in telling Mina that she was not sick she may have been seeking to influence her by the implanting that thought with Mina in the belief that it would tend to aid recovery, a striving to effectuate the thought which vitalizes a well known teaching. In insisting that Mina eat more and that she try to walk about the house it was doubtless Mrs. Huthmaker's idea, not uncommon, that Mina would thereby gain strength. Placing the most normal and reasonable construction upon this phase of the evidence it does not tend to show a disordered mind and lack of testamentary incapacity when she made the will. But if the evidence be interpreted as showing that Mrs. Huthmaker was laboring under a delusion that her sister was feigning illness, such delusion in no way affected this contested will made seven months after Mina's death. "The delusion which makes a testator incapable of making a will, must be a delusion as to or affecting some matter necessarily involved in the making of a will.'' [Hall v. Mercantile Trust Co., 332 Mo. 802, 815, 59 S. W. (2d) 664, 669.]

"A testator with mind enough to understand,'' the ordinary affairs of life, the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is

capable of making a will under the law of this State. [Sanford v. Holland, 276 Mo. 457, 469, 207 S. W. 818, 821, and cases there cited.] The foregoing may be said to constitute the essential elements of testamentary capacity though different modes of expression are found in our decisions. [Hahn v. Hammerstein, 272 Mo. 248, 259, 198 S. W. 833, 836.] In Turner v. Anderson, 236 Mo. 523, 139 S. W. 180, the requirement that the testator know and understand who are the natural objects of his bounty was amplified by adding that he also have the capacity to know and understand "their deserts with reference to their conduct and treatment of him, their capacity and necessities." "It could hardly have been intended, however," by this language, "to permit a jury to set aside a will because, in its opinion, the testator did not properly appreciate and gauge the deserts, capacities and necessities of certain relatives within the range of the statutes of descent and distribution." [Hall v. Mercantile Trust Co., 332 Mo. 802, 815, 59 S. W. (2d) 664, 669.]

In all this mass of evidence there is no evidence of substance that Mrs. Huthmaker was incapable of transacting her ordinary business affairs or that she did not know and fully comprehend the nature, extent and value of her property or that she did not know who were and all of these collateral relatives. Many of the circumstances shown in contestants' evidence are so slight and inconsequential that comment is not required to point out that viewed in the light of common experience they have no probative value whatever as tending to show testamentary incapacity. Nor is the evidence of mere personal eccentricities and peculiarities, oddities of dress or habit, that "she talked to herself" at times, became on occasion momentarily confused, sometimes changed her mind, in some instances shifted the course of her conversation, on a few occasions mentioned momentarily failed to recognize some person with whom she was well acquainted, or the other type of evidence, which, allowed its fullest implications, at most, tends to portray Mrs. Huthmaker as stubborn, suspicious, lacking in affection for her relatives, stingy, and as sometimes exhibiting a quick and explosive temper, of any probative value to show testamentary incapacity when, as here, it is not accompanied by "proof of facts and acts" showing that Mrs. Huthmaker was not, at the time she executed this will, capable of understanding the ordinary affairs of her life, of transacting her ordinary business, understanding the nature, extent and value of her property and who were the natural objects of her bounty. [Sayre v. Trustees of Princeton University, 192 Mo. 95, 90 S. W. 787; Winn v. Grier, 217 Mo. 420, 117 S. W. 48; Gibony v. Foster, 230 Mo. 106, 116, 130 S. W. 314, 317; Smarr v. Smarr, 319 Mo. 1153, 1168, 6 S. W. (2d) 860, 865; Fulbright v. Perry County, 145 Mo. 432, 46 S. W. 955; Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739; Hahn v. Hammerstein, 272 Mo. 248,

259, 198 S. W. 833, 836; Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772; Frank v. Greenhall (en banc), 340 Mo. 1228, 105 S. W. (2d) 929.] It follows that the opinions of the two experts based wholly and alone upon the facts and circumstances detailed in contestants' evidence do not constitute substantial evidence of testamentary incapacity. [Hall v. Mercantile Trust Co., supra; Berkemeier v. Reller, supra; Winn v. Grier, supra; Archambault v. Blanchard, 198 Mo. 384, 95 S. W. 834; Frank v. Greenhall, supra.]

As we have pointed out the uncontradicted evidence shows that to the very day of the fatal stroke Mrs. Huthmaker was in active touch with, understood and intelligently carried on the ordinary affairs of her life, was thoroughly conversant with and managed her property interests, investments and business affairs, and upon this record there can be no doubt that she knew who her relatives were and how and to whom she was giving her property under the will.

We think that upon a reading of Sayre v. Trustees of Princeton University, Winn v. Grier, Berkemeier v. Reller, Smarr v. Smarr, and Loehr v. Starke, citations, supra, it will appear that those cases presented facts and circumstances as tending to show testamentary incapacity as strong, if not stronger, yet, in those cases, this court held there was no substantial evidence which entitled contestants to have that issue submitted to the jury. Following the authorities cited we hold that there is no substantial evidence tending to show testamentary incapacity at the time Mrs. Huthmaker executed the will and that the issue should not have been submitted to the jury.

As to the other ground of contest, and under influence alleged to have been exercised by "the agents, servants, and representatives" of the Masonic Home. Contestants did not ask to have this issue, made by their petition, submitted to the jury. The burden of proof of this allegation is upon contestants. True, undue influence need not be proven by direct evidence but may be shown by, or inferred from, the facts and circumstances in the evidence (Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) 40) but there must be more shown than "mere oportunity to influence" or "mere suspicion." [Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46.] No fiduciary relation between Mrs. Huthmaker and any of the officers, agents or servants of the Masonic Home is made out. But if, by any sort of deduction, it be considered that the evidence does sufficiently show such relationship such fact alone would not give rise to a presumption or inference that the execution of the will was procured through the exercise of undue influence. [Loehr v. Starke (en banc), 332 Mo. 131, 56 S. W. (2d) 772; Pulitzer v. Chapman, 337 Mo. 298, 315, 85 S. W. (2d) 400, 409.] In addition to showing the fiduciary relation and the gift by the will to the fiduciary beneficiary there must be further facts and circumstances from which it can be fairly

and reasonably inferred or found that the fiduciary beneficiary actively exercised an undue influence upon the testator in the making of the will. We deem it unnecessary to discuss this matter at length, it is enough to say that the claim that such undue influence is shown rests upon veriest conjecture and forced and strained inferences and is not, in our opinion, supported by substantial evidence.

■ █ The will of May, 1930, before Mrs. Huthmaker had any contact with the Masonic Home, cut off all these relatives completely, Gustav Walkenhorst and Irene Flynn along with the others. The provisions of this contested will are set out at the first part of this opinion. By reference thereto it is obvious that by the will Mrs. Huthmaker sought to make effective the intent, evidenced by her will of May, 1930, that her property should ultimately go to a charitable institution dedicated to the care of old folks and orphan children, and that the Masonic Home was satisfactory to her in that respect.

It is our conclusion that there was no issue for the jury on either testamentary incapacity or undue influence, the grounds of contest alleged, and that proponents were entitled to a directed verdict sustaining the will. Therefore the judgment of the trial court is reversed, and the cause is remanded with the direction that a judgment be entered establishing the contested paper writing as the last will and testament of Mary Huthmaker. It is so ordered. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.*, not voting because not a member of the court when cause was submitted.