**Richard L. DIXON et al., Respondents,**

v.

**Carl WEBSTER and Josephine Webster Dean, Appellants.**

**No. KCD 27926.**

Missouri Court of Appeals,
Kansas City District.

May 2, 1977.

Motion for Rehearing or for Transfer
Denied May 31, 1977.

Application to Transfer Denied
July 11, 1977.

Alden S. Lance, Savannah, for appellants.

R. Dan Boulware, St. Joseph (Brown, Douglas & Brown, St. Joseph, of counsel), for respondents.

Before SWOFFORD, P. J., PRITCHARD, C. J., and DIXON, J.

PRITCHARD, Chief Judge.

This is an action to contest a will in which respondents were successful before a jury in setting aside the will of Blanche Robinson, deceased, which was executed August 31, 1972. The grounds submitted to the jury for the setting aside of the will were that Blanche was not of sound and disposing mind and memory at the time she signed the will, and that she was suffering under an insane delusion as to Richard Dixon at that time. The dispositive issues concern whether or not either of these matters were supported by sufficient evidence to sustain the verdict of the jury. Respondents suggest that the appellants' points be disregarded because under the claim that instructions were improperly given on the issues the instructions are not set forth in their brief. It is clear, however, from the brief that submissibility of respondents' case is the issue, and the suggestion is declined.

Blanche had been married to Kenneth W. Robinson who died October 21, 1971. On September 10, 1970, Kenneth executed a revocable trust to trustee, American National Bank of St. Joseph, for the benefit of himself and Blanche. On the same date, Kenneth executed his last will and testament under which the residue and remainder of his estate, if Blanche survived him, was given to the same trustee for her benefit during her lifetime. By paragraph 2.3 of Item II of Kenneth's will, it was provided that the trustee should pay over the trust estate "to or for the benefit of such persons or corporations *or the estate of my said wife,* * * * as my said wife may have appointed by specific reference to this power in her last Will and Testament. The power of appointment herein granted to my wife is exercisable by her alone and in all events, but if such power of appointment is, for any reason, not effectively or fully exercised by my said wife, then that part or all of the principal and undistributed net income of the Trust Estate not so appointed by her shall be distributed to the beneficiaries named in Item III of this Will who would have taken the same had I died immediately following the death of my said wife." [Italics added.]

Item III of Kenneth's will made certain specific gifts, including $500.00 to Fillmore Cemetery, and by paragraph 3.2 gave in trust $25,000 to American National Bank "for the use and benefit of RICHARD L. DIXON, if living, or for his children if he is deceased", with certain provisions for distribution of the trust principal and income.

On January 26, 1971, Blanche made a will reaffirming Kenneth's gift in trust to Richard L. Dixon, and providing that if that gift was not paid in full the balance needed to pay it was to be paid from her estate, which if in turn was insufficient, the balance was to be paid under her power of appointment given her by Kenneth.

Blanche's will, here in contest, was executed by her on August 31, 1972, appointed (under the power of Kenneth's will) the $25,000.00 trust fund for Richard L. Dixon or his children to Blanche's own estate. Richard and his existent children joined to contest this last will. Blanche died on January 26, 1973.

For proponents, Dr. Wilbur McDonald, M.D., testified. He had treated both Kenneth and Blanche since August 4, 1949. Both of them went from a hospital to Hill Haven Convalescent Center where both remained until their deaths. According to Dr. McDonald, Blanche was a schizophrenic, a split personality, with delusions, negativisms, and she withdrew socially. "She had all the characteristics of a dementia precox, which is another name for schizophrenic," and "There is no treatment for it. * * * Blanche was a schizophrenic as long as I knew her. Gradually she———Schizophrenia comes and goes. People can be perfectly normal for long periods of time and then they get off on one of these demented periods or depressed periods and it is very obvious that they are schizophrenic. At other times it is not obvious at all. They can act normally. * * * Well, Blanche was a nice looking girl in younger days and she had delusions that she had intercourse with Lawrence Tibbetts. He had gotten to her and she had a guilt complex that was so much so she wouldn't spread her legs apart for an examination by me or for anything else. * * * Q Let me ask you this: At about the time say around August 31, 1972, were you seeing Mrs. Robinson rather regularly at that time, sir? A Yes, I saw her August 30th, I think. August 30, 1972. Q Did you note anything unusual about her condition at that time, sir? A Not particularly. My notes here say, 'Deteriorating slowly. Sleeps a lot. Heart regular.' Q

The extent of your notes don't reveal she recited any delusions at that time? A No, we usually had a little conversation when I went in there. Sometimes we would talk a bit—talk about family, talk about friends and talk about the weather. Q Did she seem to be oriented with respect to those discussions? A Most of the time, yes." Dr. McDonald was not permitted to give his opinion as to Blanche's testamentary capacity on August 30, 1972, but he testified further: "Doctor, did you notice any improvement in Blanche Robinson's physical and mental condition after she left the home and went to the institutional care, first at the hospital and then Hill Haven? A Yes, sir, there was quite a bit of improvement in her general physical and mental condition as soon as she got cared for. Q Was that a decided improvement, sir, in your opinion? A It was a noticeable improvement, certainly. Of course, I saw her at more regular intervals then. * * * Q You say you saw her August 30, 1972 and I think you have described what your notes say there, that there was gradual deterioration. In what respect? What were you talking about? A Mainly physical deterioration. I don't think this was deterioration mentally. These people mentally can be pretty alert one day and not so alert the next. They can be demented one day and perfectly sane for all practical purposes the following day. Q You didn't see anything unusual as far as her mental condition was concerned August 30th? A She was deteriorating physically. This was a gradual physical deterioration. She sits there and doesn't move and first one system begins to slow down and break down and then the next. Q Did she ever recite to you any fears or delusions about Richard Dixon? A Not that I remember."

Thomas D. Watkins was present and was a witness to Blanche's will of August 31, 1972. J. W. Roberts, who wrote the will, and who was also present and a witness to it, asked Blanche as to each item of the will if that was what she wanted, "Then she would respond in the affirmative. There were occasions when she did not respond at

all, but Mr. Roberts would repeat himself and then she would respond, but she did not respond to each item." She dated and signed the will, and she was asked if she wanted them to witness it, to which she replied in the affirmative. Based upon his observations during the execution of the will, it was his opinion that Blanche was competent to execute it, "It did not occur to me at the time there was any question as to her mental competency." On cross-examination, Mr. Watkins testified: "Q Did she discuss any of the provisions of the will in your hearing? A There may have been a previous discussion of the provisions deleting Dixon from the will. Q Do you have a recollection of that discussion? A Not a clear recollection, Mr. Douglas. I recall that Mr. Roberts brought this provision to her attention, and I believe she replied something to the fact that, 'I thought he was stealing from me,' or words to that effect, but there was no detailed discussion."

Attorney J. W. Roberts was called to the nursing home on August 23, 1972, and talked with Blanche. "She was very upset. She said something terrible had happened and I asked her what it was. She stated that Richard Dixon had been doing something for her. He was there tending to her or words to that effect, and that they had a falling out or disagreement. That he said he wasn't going to come back again and he was through with her, or words to that effect. Then she said that he told her that he was going to take some property that she referred to as her treasures or he would keep it or see she never saw it again, * * *." The property was supposed to be jewelry and a family land grant signed by Thomas Jefferson and James Madison "and therefore very valuable." Mr. Roberts asked Blanche if she wanted him to sue to recover the property, and she answered, "No, it wouldn't do any good. He would only destroy it." Mr. Roberts testified further: "Q Did she give any specific business or direction which she may have asked you to carry out? A She said she wanted to take him out of her will and to keep him from getting the $25,000.00. She knew he

was to receive $25,000.00, and she said, 'Can you take him out,' or words to that effect, and I said, 'Yes, you can do that if that is what you want to do,' and I think some point came up, was there any other change she wanted to make in her will and she said yes, she wanted to leave $500.00 to the Fillmore Cemetery. * * *." On the date of execution of the will, Blanche asked Mr. Watkins if the will "got the $25,000.00 out and I said yes, it did." It was Mr. Roberts' opinion based upon his observations of Blanche, particularly when she executed the will, that she was able to understand the ordinary affairs of life; that she had the mental ability to understand the nature and extent of her property; and that she was able to know the persons who were the natural objects of her bounty; and that she was able to understand that the document she was signing would dispose of her property to the persons and in the manner provided in the document. On further cross-examination, Mr. Watkins testified: "Q Now, will you repeat again to the jury what discussion you had with Blanche Robinson with reference to changing the bequest or rather seeing that the Richard Dixon request was nullified? A The crux of it was she wanted it out of there. Q Did she tell you why? A Yes, she told this story which I related before about—I guess it would boil down to two things. One, he was rude to her and had deserted her, or words to that effect, and two, that she had given him these things for safekeeping and he had said she would never see them again, or words to that effect. * * * Q Did she say anything else with reference to Richard Dixon which she gave as a reason for removing this bequest? A She didn't say it as a reason. At one time, and I don't know which trip it was or whether Tom was there with me or not, she said, 'If he knew he was getting this, he might kill me.' I said, 'Oh, now,' you know."

O. W. Watkins, Jr., testified that he had been attorney for both Kenneth and Blanche since the mid-1960s. He drafted Kenneth's trust and his will which were executed on September 7, 1970. For

Blanche, he drafted a management trust which she did not sign on September 7, 1970, for fear that the bank would not be honest with her money, but she did sign a trust instrument drafted by J. W. Roberts on January 15, 1971. According to O. W. Watkins, Jr., the Robinsons wanted to be certain that the Dixons were taken care of and that Kenneth thought that Richard Dixon had not the financial experience to manage the funds. As to Blanche, Mr. Watkins testified she was mistrusting and she believed Clovis McWilliams and Gil Burnham were going to steal from them. She had delusions concerning Nelson Eddy [Mrs. Watkins testified that Blanche had a delusion that Nelson Eddy was in love with her, had asked her to marry him, and that the biggest mistake she ever made was in not doing so.] Mr. Watkins took notes for Blanche's will between the time she had her teeth out and the time she entered the hospital, August 16, 1970, but he did not prepare the will because she kept changing her mind. He gave his opinion, objected to as too remote to prove or disprove, that Blanche "did not have the mental capacity to execute a will in 1970 or thereafter", he would not have written her one, and he believed she was completely under some delusion. Mr. Watkins was not aware that Blanche's wills of January 26, 1971, and August 31, 1972, had been prepared by his law partner, J. W. Roberts, and had been executed by her.

Richard Dixon testified at considerable length as to services he had rendered the Robinsons, mostly before they went to the hospital and to the convalescent home, for which he was mostly paid by them. Blanche never did accuse him of taking anything from her or of doing anything wrong. He and she had never had a falling out. On February 8, 1971, Blanche signed a writing, "Richard Dixon has a basket of jewelry, furs, 2-pictures and a purse at his house for safekeeping at my request." The jewelry was turned over to the American National Bank by Mr. Dixon.

■ It is of no consequence that Blanche may have had delusions, or even insane delusions, as to amorous affairs with Lawrence Tibbetts and Nelson Eddy, or with other persons in the community as the evidence tended to show. Those delusions can have nothing to do with the execution of the will here in contest on the issue of insane delusion as to Richard Dixon. "As we understand the law, the delusion which makes a testator incapable of making a will must be a delusion as to or affecting some matter necessarily involved in the making of a will, and not as to some extraneous or collateral matter or fact." *Hall v. Mercantile Trust Co.*, 332 Mo. 802, 59 S.W.2d 664, 669[7, 8] (1933); *Rex v. Masonic Home of Missouri,* 341 Mo. 589, 108 S.W.2d 72, 84[3] (1937); 1 Page on Wills, § 12.48, pp. 657, 659.

Appellants here undertook their initial burden of proof by presenting evidence that Blanche possessed the mental capacity to make her will of August 31, 1972. The burden was then upon respondents to prove that on that date she lacked general testamentary capacity or specific testamentary capacity because of an insane delusion. *Hall v. Mercantile Trust Co.,* supra; *Ahmann v. Elmore*, 211 S.W.2d 480, 486[1] (Mo.1948); *Hardy v. Barbour*, 304 S.W.2d 21, 25[1] (Mo.1957).

■ As to the elements of proof to establish an insane delusion the courts of this state have often stated: "Insanity, such as will render a person incapable of making a will, may be general, or it may be partial. It may be termed 'monomania' or a 'delusion'; but the authorities agree in holding, as embodied in the instructions given in this cause, that where a person imagines something extravagant to exist which really has no existence whatever, *and he is incapable of being reasoned out of his false belief*, he is in that respect insane, \* \* \*." [Italics added.] *Buford v. Gruber*, 223 Mo. 231, 122 S.W. 717, 722 (1909). [In *Buford*, after the testator had conceived the false belief that Bessie was not his child, and by innuendo at least accused his wife of not being true to her marriage, "Mrs. Gruber remonstrated and reasoned with him, and so did his children and the old colored woman who lived

in the yard; but, instead of listening to them, he became insanely angry and raved like a madman. This conduct continued up to the time of the death of Mrs. Gruber in March, 1901." 122 S.W. at 723.] *Gaume v. Gaume*, 340 Mo. 758, 102 S.W.2d 636, 640[1, 2] (1937); *Higgins v. Smith*, 150 S.W.2d 539, 543[8] (Mo.App.1941). Some of the cases involving issues of insane delusion, turning on their own facts, omit the element above italicized to the effect that the testator is incapable of becoming permanently disabused by argument, reason or proof from his false beliefs, e. g., *Ahmann v. Elmore*, 211 S.W.2d 480 (Mo.1948), where the testator had evidentiary basis for his belief that a son was not his child, as recited in his will that he was begotten before he was married to his mother. The definition of the *Buford, Gaume* and *Higgins* cases, supra, is, however, in accord with the definitions by other authority and jurisdictions. In 1 Page on Wills, § 12.34, p. 638, it is said, "A further test of the insane delusion is that it cannot be removed, or at least permanently removed, by evidence. This follows naturally from the fact that it is not founded upon evidence; but though a mere corollary, it is in practice a very valuable test—possibly the most valuable of those as yet suggested by the courts. A mistake made by a sane person is always susceptible of correction. When evidence clearly demonstrates that a mistake exists, that of itself corrects such mistake in the mind of the person who was deluded. Further, many mistakes made by a person who is actually insane may be corrected in this way. But the insane delusion cannot be thus corrected. No amount of evidence is capable of correcting the mistake in the mind of the person suffering from the delusion, permanently at least. A belief that food was poisoned is not an insane delusion if the testator would eat it after other persons had first partaken thereof."

At page 886, Part II, § 3, of the extensive annotation "Testamentary Capacity—Delusions," 175 A.L.R. 882, definitions and evidential requirements are set forth which are in accord with the *Buford, Gaume* and *Higgins* cases, supra. In commenting on *Middleditch v. Williams*, 45 N.J.Eq. 726, 17 A. 826 (1889), which referenced the definition of Sir John Nicholl in *Dew v. Clark*, 3 Adams Eccl. 79, 162 Eng. Reprint 410 (1826), the annotator says, "In this definition the court noticeably omits the element of persistence against argument and reason." In the supplemental decisions to those contained in 175 A.L.R. 882, are these following cases: *In re Selb's Estate*, 84 Cal.App.2d 46, 190 P.2d 277, 281[4–6] (1948), et seq., quoting *Estate of Kendrick*, 130 Cal. 360, 62 P. 605 (1900), the court said, " 'But an insane delusion is the spontaneous production of a diseased mind, leading to the belief in the existence of something which either does not exist or does not exist in the manner believed,—a belief which a rational mind would not entertain, *yet which is so firmly fixed that neither argument nor evidence can convince to the contrary.' * *.*" The *Kendrick* court then considered "that it did not appear that decedent had ever been reasoned with upon the matter, *or any effort made to convince her of the falsity of her belief*; and that 'If she believed it upon the evidence of her senses, or upon the statements of some one in whom she had confidence, no matter how ill-founded her conviction might have been, it could not be placed in the category of insane delusions.' " [Italics added.] In *Jackman v. North*, 398 Ill. 90, 75 N.E.2d 324, 330[7, 8] (1947), it was said, " 'An insane delusion is a belief in something impossible in the nature of things, or impossible under the circumstances surrounding the afflicted individual, *and which refuses to yield either to evidence or reason.' * * *.*" [Italics added.] The court in *In re Millar's Estate*, 167 Kan. 455, 207 P.2d 483, 487 (1949), said, "A belief does not amount to 'an insane delusion, unless it appears that his belief is wholly without any basis whatever *and that the testator has obstinately persisted in it against all argument which may have been employed to dissuade him.* * * * '." [Italics added.] In the case of *In re Klein's Estate*, 28 Wash.2d 456, 183 P.2d 518 (1947), the testatrix believed that her daughter

was poisoning her, without foundation in fact, and efforts were made to dissuade her from her belief, but without avail. *Klein* was cited in *In re O'Neil's Estate*, 35 Wash.2d 325, 212 P.2d 823, 828 (1949), where the element of insane delusion that "he cannot be dissuaded by any evidence or argument" was set forth. See also *In re Gwinn's Estate*, 36 Wash.2d 583, 219 P.2d 591 (1950), also quoting *Klein*, where the testator was not dissuaded by his attorney's counsel to think over the false accusations he had made against his son and to take more time before making a will disinheriting the son, but he returned to the attorney's office laboring under the same delusion. For the same statement as to persistence in the delusion in the face of evidence and argument, see *In re Estate of Weil*, 21 Ariz.App. 278, 518 P.2d 995, 999 (1974); *In re Estate of Hodtum*, 267 So.2d 686, 688 (Fla.App.1972); *Benjamin v. Woodring*, 268 Md. 593, 303 A.2d 779 (1973); and importantly, note the hypothetical illustration in *In re Estate of Protyniak*, 427 Pa. 524, 235 A.2d 372, 376 (1967), quoting from *In re Sommerville's Estate*, 406 Pa. 207, 177 A.2d 496, 502 (1962), " '* * * it is not enough that the testatrix should have a delusion—it must be an insane delusion. This distinction has been clearly drawn ever since 1902 when this Court in *Bennett's Estate*, 201 Pa. [485] at page 490, 51 A. at page 336, supra, said, "But all delusions are not insane delusions. A man may, from information given him, believe that his son is dead, when in point of fact, the son is alive. The father's belief is a *delusion* ; and if, when his son appears to him in person and explains that the information was false, the father persists in thinking him dead, his belief becomes an *insane delusion*. The difference between the two species is that one is the product of the reason, and the other a figment of the imagination." '." The *Sommerville* case contains an excellent exposition of the definitions of insane delusion.

■ In this case, all that the evidence indicates is that Blanche was laboring under a mere delusion that Richard L. Dixon was stealing from her; that they had a falling out or disagreement; that he was not going to come back again and he was through with her; and that he told her that he was going to take some property that she referred to as her treasures or he would keep it or see she never saw it again. There was no evidence at all that anyone ever attempted to dissuade Blanche from her expressed, non-factual beliefs and that in consequence thereof, she persisted in them "and refused to yield to either evidence or reason." Thus, respondents' evidence fails to establish by substantial evidence that Blanche was possessed of an *insane delusion* which caused her to exercise the power of appointment of Kenneth's bequest to the Dixons [which power of appointment she understood as being provided by Kenneth's will under the evidence]. For this, and for the reason that there was no substantial evidence of Blanche's general lack of testamentary capacity discussed below, this case must be reversed and remanded for new trial. It may be that there will be no evidence available to establish an insane delusion under the standards above announced, in which event contestants' case must fail as in any case where evidence to establish essential elements to a claim to relief is non-existent.

■ Turning now to the matter of general lack of testamentary capacity, it is evident also that there was none presented that Blanche, on August 31, 1972, did not understand the ordinary affairs of life, the value and extent of her property, the number and names of the persons who were the natural objects of her bounty, their deserts with reference to their conduct and treatment of her, and their capacity and necessities. *Sturm v. Routh*, 373 S.W.2d 922, 928[3] (Mo.1964); see also *Lewis v. McCullough*, 413 S.W.2d 499, 505[10] (Mo.1967), quoting from *Adams v. Simpson*, 358 Mo. 168, 213 S.W.2d 908, 911[2] (1948). "The mental competency of the testator to make a will is to be determined as of the date of the execution of the will, * * *." 94 C.J.S. Wills § 5, p. 684; *Whitacre v. Kelly*, 345 Mo. 489, 134 S.W.2d 121, 124[1–3] (1939), and cases cited; and *Shearrer v. Shearrer*, 259 S.W.2d 705, 719 (Mo.App.

1953). And although "evidence of occurrences and circumstances prior to and closely approaching the time of the execution of the will, and shortly subsequent thereto, which tends to shed light on the question of testamentary incapacity and tends to show the condition of testator's mind at the time of the execution of the will, is competent," [*Proffer v. Proffer,* 342 Mo. 184, 114 S.W.2d 1035, 1040 (1938)], yet the testimony of Mr. O. W. Watkins, Jr., on that subject "after 1970" is not sufficiently close in time to the execution of the will to have any probative force. That testimony, being without foundation or basis based upon personal observation after 1970 to August 31, 1972 (a year and nine months), is conclusionary and without probative value. The delusions which Mr. Watkins said she had, other than those about Nelson Eddy, are unexplained, and again it is not shown that any such delusions were not removable by argument and evidence.

The judgment is reversed and the case is remanded for new trial. If, upon new trial, proponents' evidence is substantially the same, and if contestants should produce no more evidence than herein set forth, the trial court should direct a verdict for proponents. *Ahmann v. Elmore,* 211 S.W.2d 480, 488 (Mo.1948).

### ON MOTION FOR REHEARING OR TRANSFER

#### PER CURIAM.

In their motion for rehearing or for transfer to the Supreme Court respondents say that this court has imposed a requirement that the evidence show that the testatrix must be reasoned with and attempts must be made to dissuade her from her non-factional beliefs in order to establish an insane delusion, and that the same is contrary to Missouri decisions. Cited is *Byars v. Buckley,* 461 S.W.2d 817 (Mo.1970). That case, loc. cit. 461 S.W.2d 820[3], iterated the rule enunciated in this opinion, " 'An insane delusion is defined to be a false and fixed belief not founded on reason and incapable of being removed by reason.' " At page 821, the court went on to say, "We do not hold that in every case there must be evidence that someone took issue with testator and tried to reason him out of the delusion." [This is the same as that alluded to in this opinion, supra, "Some of the cases involving issues of insane delusion, *turning on their own facts,* omit the element above italicized to the effect that the testator is incapable of becoming permanently disabused by argument, reason or proof from his false beliefs, \* \* \*." (Emphasis here added.)] What is undoubtedly meant by the above last quote in *Byars* is that the degree or intensity of a delusion may be sufficient for a conclusion that it amounts to an *insane* delusion in some cases as affecting testamentary capacity. In *Byars* the facts are similar to those here in that the matter of delusion was discussed only once, "and that Mr. Clerk did not seek or obtain any details and did not endeavor to dissuade testator from the alleged delusion." Here, the attorney for Blanche who drafted her will discussed the matter only once, and he did not attempt to dissuade her from her expressed feelings about Richard Dixon. This similar situation prompted the *Byars* court to say, "It seems to us that something more than is here shown is required to warrant a conclusion that testator had a fixed persistent belief which could not be removed by reason." It is apparent that the *Byars* case supports the opinion herein.

Other matters presented have been considered and the motion for rehearing is overruled, and the motion to transfer to the Supreme Court is denied.