**Richard L. DIXON et al., Respondents,**

v.

**FILLMORE CEMETERY et al., Appellants.**

**No. WD 30506.**

Missouri Court of Appeals, Western District.

April 7, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 5, 1980.

Application to Transfer Denied June 12, 1980.

W. H. Utz, Jr., W. H. Utz, III, St. Joseph, and Alden S. Lance, Savannah, for appellants.

Robert E. Douglas, Suzanne Bocell Bradley, St. Joseph (Brown, Douglas & Brown, St. Joseph, of counsel), for respondents.

Before WASSERSTROM, C. J., Presiding, and PRITCHARD and SWOFFORD, JJ.

PRITCHARD, Judge.

An original appeal in this case resulted in a reversal and remand for new trial upon the principal ground that there was insufficient evidence to show that at the time testatrix's will was executed she was suffering from an insane delusion. It was also held that the evidence was insufficient to show testatrix's general lack of testamentary capacity, and the opinion noted, "If, upon new trial, proponents' evidence is substantially the same, and if contestants should produce no more evidence than herein set forth, the trial court should direct a verdict for proponents." See *Dixon v. Webster*, 551 S.W.2d 888, 895 (Mo.App.1971). A new trial was had, but the issue of testatrix's insane delusion was not submitted to the jury, and its verdict setting aside the will was based upon a finding of general lack of testamentary capacity. Proponents again appealed which resulted in an opinion reversing the judgment. A motion for rehearing upon that opinion was granted, and the court requested further briefing on the issue of whether testatrix's statement that she thought the Dixons were stealing from her, and being dissuaded by witness Clovis Williams, bore upon the second trial submission of general lack of testamentary capacity.

Upon rehearing respondents, as they had a right to do, reargued the matter of testatrix's general lack of testamentary capacity. The entire record will be reexamined to determine if the first opinion (551 S.W.2d 888) was in error on that issue, and whether the judgment upon the jury's verdict in the second trial should be affirmed upon the same issue.

The preliminary facts as stated at 551 S.W.2d 889, here paraphrased, are: Testatrix, Blanche Robinson, had been married to Kenneth W. Robinson, who died October 21, 1971. His will of September 10, 1970, gave to Blanche a power of appointment over certain bequests, one of which by Item III of Kenneth's will gave to Richard L. Dixon $25,000 in trust. Blanche affirmed that bequest in a will executed by her on January 26, 1971, but in her will, executed August 31, 1972, Blanche appointed (under the power of appointment in Kenneth's will) the $25,000 trust fund to her own estate. This latter will is the one now in contest.

The second trial began on July 19, 1978, with this evidence, which is here detailed from that record: J. W. Roberts testified that he was a lawyer with Strop, Roberts and Hale, in St. Joseph. In 1972, Obie Watkins and Tom Watkins were members of that firm. J. W. became acquainted with Blanche sometime in 1971 in a legal relationship, doing some various things for her, including in January, 1971, talking to her about a will, and about her affairs generally. Before her death, which occurred January 26, 1973, J. W. saw her six to eight times, in addition to conferences with the trustee bank. About a week before the will in question was executed, J. W. received a phone call from the convalescence center, where Blanche was a patient, that Blanche wanted him to come up there. When he did go up shortly after the call, she told him she wanted to change the will and take out all benefits for Richard Dixon, asking "Can I do that?" "I said, 'Yes, you

can, if that's what you have decided to do.' She said that she did." Blanche wanted Dixon out of the will because he had spoken impolitely to her and told her he was tired of working for her—"she had in essence had a falling out with him; that she was mad at him." Blanche stated to J. W. on one occasion that if Richard Dixon knew that he was not getting this (the $25,000) he might kill her. Blanche also stated she had given Dixon some personal objects, treasures, which he had been keeping for her, "and he now says that I'll never see them again, or that he will take them and keep them." Blanche refused to let J. W. do anything about recovering this property. Tom Watkins went with J. W. to execute the will he had prepared. At that time Blanche asked J. W. if the will was written the way she stated, and he answered that he had done so. He sat next to her and explained the legal effect of each provision. J. W. was of the opinion that Blanche was able to understand the ordinary affairs of life; the nature and extent of her property which she was disposing of; she knew the persons who were the natural objects of her bounty, and her natural obligations to those persons. On cross-examination, J. W. testified that the first time he handled business for Blanche was in January 1971 (when he prepared a will for her, which she executed, affirming the trust provision for the Dixons made by Kenneth), and he saw her about a half dozen times thereafter. Thomas D. Watkins, attorney, practiced with J. W. in 1972. He had known Blanche since he was a child. He was a witness on her August 31, 1972, will. Proponents' evidence is substantially the same as that detailed in the original opinion, *Dixon v. Webster*, supra, and, of course, proponents made a case in favor of the will. It should be noted, however, that Doctor Wilbur McDonald, Blanche's attending physician, testified in this trial that she would have been able to understand the nature of her property and the objects of her bounty when he saw her on August 30, 1972. Doctor McDonald did testify again that Blanche was a schizophrenic, a split personality, which according to him was defined as "a psychiatric disor-

der that is characterized by progressive withdrawal from the environment or surroundings, with regression or slow deterioration of the emotional responses to those surroundings." Schizophrenia means you can't face reality at times, and persons afflicted with it have hallucinations; they dream; they fantasize; then they withdraw. Blanche thought she had sex relations with Nelson Eddy, and had a guilt complex about it. She told Doctor McDonald that she had that sexual relation "and that no one else was ever going to get to her again." She kept her legs together until they solidified in that position and never spread them—"that was one of her hang-ups." She was 81 years old, and had delusions for at least ten years. "[B]ecause she was schizophrenic she wouldn't move; she was negativistic. You couldn't get her to do the things that you wanted her to do." And "A Well, schizophrenia does not—the deterioration there is in the control of the emotions, or the splitting. The deterioration is not in the intellect. Schizophrenics can be very smart and stay smart. If there was any deterioration in her intellect, it would be on an arteriosclerotic basis. Q That would be normal for anyone her age? A * * * She was intelligent. The deterioration would not be due to the schizophrenia." On cross-examination: "Q Doctor McDonald, a person that is a schizophrenic, if I'm pronouncing that correctly, can be alert one day and demented the next? A Yes. Q Isn't that correct? A Yes, sir. Q I think you so testified in virtually those very same words when you testified before. In other words, when you saw Blanche Robinson on August 30, she could have been demented on the 29th, felt good on the 30th, been demented on the 31st, felt good on the 1st, and so forth, isn't that certainly a possibility? A That is possible but not probable, because she didn't change that rapidly. Usually, at that time, if they get demented, they stay demented for a while. It's not a day-to-day basis. Q I understand, but what I'm saying, you have no way of knowing on the 31st of August whether or not she would have been demented because you did not see her that

day? A That's right. Q Now, Blanche Robinson, through your knowledge of her and through treatments and your acquaintance with her, she did have delusions, did she not? A Yes, she did. Q In fact, she suffered delusions all the time that you knew her, isn't that correct? A I don't that because I knew her for a long time before I knew she had delusions. Q I think maybe I misstated what you have stated earlier. I think you stated that she at least had delusions for at least ten years? A That's better. Q I think you also stated that she had been schizophrenic for as long as you had known her? A I think that's right." After 1968, she became a recluse, which was after she had her teeth removed, and she would not walk around. The Dixons cared for the Robinsons for about a year and a half before they moved to a nursing home, during which time Blanche remained in bed. Richard Dixon had done work for the Robinsons for about 10 to 15 years, and there was a close relationship between the two families.

Respondents' evidence follows:

Phyllis Dixon helped her husband in cleaning the Robinson house and in taking care of Blanche who "was in bed, unable to care for herself, and I would bathe her, change her bed." Blanche was not able to go to the bathroom during that period. Blanche used to say that Mr. McWilliams was taking things—she thought he had got into the bank safety deposit where they kept the jewelry and that Mrs. Burnham and Mrs. McWilliams had worn some of it.

Clovis McWilliams was formerly Kenneth's business partner. He had known the Robinsons since the late 1930s. Blanche had called Clovis more than once about Keller Fur Company saying that she was quite sure that they had sold or disposed of her furs. He told her he didn't think that was possible, and when he suggested that he would talk to Mr. Cohen and have him come out, she would say it wasn't necessary. She discussed it several times, and almost every time Clovis saw her she was mistrustful of someone. On numerous occasions she was quite concerned that Mr. Carver, or

someone at the bank was not being honest about the money and probably was stealing from her. One time, after the Robinsons were at the nursing home, Blanche said, " 'I think the Dixons are stealing from me,' or, 'Have some of my things,' or 'they run off with some of my things.' I can't remember the terms but a mistrust as far as some of her property is concerned. Of course, as in the case with the bank and the furrier, all the other situations, I was discussing them for a long time. I said, 'Well, Blanche, I just don't think that's true. The Nixons have been your friends for years. I don't think they would do that.' Then she would change the subject and talk about something else." Clovis alluded to Blanche's having a fantasy, a hang-up for a good many years that she had a lover, who finally came out to be Nelson Eddy, the singer. On many occasions she indicated what a horrible mistake she had made in not going away with him. That reference became more frequent. "She knew that he was in love with her, or something to that effect."

By transcript from the previous trial, Carrie Ann Watkins testified. She is the wife of O. W. Watkins, Jr., having been married to him for 23 years. Carrie had known Blanche all her life, Blanche being a best friend of Carrie's mother, who ran an antique shop. Blanche, being interested in antiques, came to the shop every afternoon, and when she got older and did not drive too much, she would come over and sit in the shop all afternoon. After Blanche had her teeth pulled and never went out again, she called (the shop) every afternoon at least once, and sometimes two or three times. Carrie went by the home thereafter, but Blanche did not like it—she did not want anybody to see her except the Dixons, saying, " 'I haven't been bathed. My hair is falling out. I don't want anybody to see me.' She was a recluse." During this time, Blanche affirmed to Carrie that she wanted Richard Dixon to get his $25,000, and asked Carrie to see to it that Obie (O. W. Watkins, Jr.) made sure that he got it, this being repeated by Blanche even at the convalescence center, and even after Kenneth's death. Carrie testified further that

Blanche had a crush on Nelson Eddy, saying " 'Well, here's Kenneth laying here drunk, cursing me, and I could have been married to Nelson Eddy. It was the worse mistake I ever made in my life not marrying Nelson Eddy." And, "It got worse. It got worse as Blanche got worse. This phobia about Nelson Eddy got worse. What a mistake it was she didn't marry him when he asked her. It was the worse mistake she ever made in her life. That is why she is in the predicament she is in. Q As far as her knowledge of her personal belonging was concerned, was she aware of what she owned and had? A Yes. Q Did she ever lose that awareness of your knowledge? A No; I wouldn't say she did." Clovis McWilliams and Gil Burnham had keys to the Robinson safe deposit box, and Blanche thought they went into it so their wives could wear her jewelry to the county club. As to the Keller fur incident, Blanche told Carrie that she had three beautiful fur coats at that firm, which Mr. Cohen had stolen and sold. "I said, 'Blanche, this couldn't be done.' I said, 'I'll tell you what I'll do. I will have those coats sent out tomorrow.' She said, 'I will never see the coats.' " Carrie called Mr. Cohen, who said he would send out the coats, and then she called Blanche, who called Mr. Cohen and told him not to send the coats out. "I asked her why. She said, 'Well, it wouldn't be my coats. He's already sold mine and I don't want to see the cheap replicas he would be sending.' "

Also by previous trial transcript, O. W. Watkins, Jr., testified: He was a practicing attorney in St. Joseph. He first represented the Robinsons after Kenneth retired when he wanted to talk about a trust which he had discussed with George Richmond, then president of the American National Bank. After the Robinsons were both in the convalescent center, Clovis McWilliams called, and O. W. was asked if he would go up and go over with them the creation of a trust, which he did. He wrote a trust and a will for Kenneth and a trust for Blanche, and he took notes for Blanche about what she wanted in her will, but he did not draft a will for her. Kenneth's will was executed by him in Blanche's presence. The trust and will documents were dated September 10, 1970. Blanche continued to call O. W. about the documents and finally she got to the point of calling him every day the substance of the conversations being: Blanche had the idea that Clovis McWilliams and Gil Burnham were going to steal everything she had. "She talked about her jewelry but she wasn't worried so much about the jewelry as everything else. She kept saying, 'I don't know what is going to happen to us because we won't have anything left. What can we do? I would reply, 'You can execute a trust.' " By that time, O. W. had destroyed it [the drafted trust instrument] because it had been lying there so long. Finally Blanche said, " 'Well, then, I want to fix it. Go ahead and set up the trust.' So I set up another trust agreement for Blanche, just for Blanche, transferring all of her affairs to the American National Bank." This was after the time Blanche had her teeth pulled because she was not at home, and prior to the time she was in the convalescent center, and a year or two after O. W.'s first preparation of documents. On calling her and having the document read, she told him to mail it to her which he said he could not do. He told her he would bring it, and a will he had prepared, and she said, " 'No, you can't do that,' " giving as her reason that she looked so terrible that she was afraid Nelson Eddy would hear about her appearance. "She also had told me that numerous men in St. Joseph were in love with her and she didn't want them to know what she was like." O. W. tried to talk her into letting him in the door and sitting down, but she flatly refused. He did not try to get into the house because she told him not to come. Blanche continued to call him so many times that O. W. told the girls at his office to give her call to somebody else. The documents were never signed by her. She had told him one thing that she wanted in her will—if there was not enough money in Kenneth's estate, for him to see that the Dixons got the $25,000, which was consistent with what she told him before. Other provisions were not con-

sistent. O. W.'s notes showed one-fourth to somebody, which was changed to an eighth, then to a seventh. "You know, the fourth is scratched out and the eighth is written in. And the eighth is scratched out and the seventh is written in. Then some names and then the names scratched out, so that after I got through with my notes I couldn't tell what she wanted." Blanche did not want to sign her trust instrument on the date that Kenneth signed because she was not sure that the bank would be honest with the money. "She was by then suspicious of the influence that Clovis and Gil Burnham had. Why she picked on them I don't know. They were her best friends. Q Did she say this in your presence? A Yes. * * *" Omitted from being read to the jury was O. W.'s previous first trial opinion that Blanche did not have the mental capacity to execute a will in 1970 or thereafter and he would not have written her one [ruled not sufficiently close in time to the execution of the will to have any probative force, 551 S.W.2d 895].

▮ It is true, as respondents say, in the oft repeated cliché, that on review of a will contest case their evidence must be taken as true, and proponents-appellants will be disregarded unless it aids respondents' case. *Byars v. Buckley*, 461 S.W.2d 817, 819 (Mo. 1970); *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo.1967). But it is also true, that after proponents of a will have established a prima facie case, contestants must come forward with *substantial* evidence that testatrix lacked the mental capacity to execute the will. *Houghton v. Jones*, 418 S.W.2d 32, 39[3, 4] (Mo.1967); *Spencer v. Spencer*, 221 S.W.2d 58, 61[1] (Mo.1920).

▮ The first premise is that "A testatrix, having sufficient mental capacity, may dispose of her property to whomever and however she desires at the time. *Berberet v. Berberet*, 131 Mo. 399, 33 S.W. 61, 64; *Callaway v. Blankenbaker*, 346 Mo. 383, 141 S.W.2d 810, 816." *Sweeney v. Eaton*, 486 S.W.2d 453, 456[4–6] (Mo.1972); *Rex v. Masonic Home of Missouri*, 341 Mo. 589, 108 S.W.2d 72, 74[1, 2] (1937), in which case at page 85[5, 6], the court commented further:

"Nor is the evidence of mere personal eccentricities and peculiarities, oddities of dress or habit, that 'she talked to herself' at times, became on occasion momentarily confused, *sometimes changed her mind*, in some instances shifted the course of her conversation, on a few occasions mentioned momentarily failed to recognize some person with whom she was well acquainted, or the other type of evidence, which, allowed its fullest implications, at most, tends to portray Mrs. Huthmaker as stubborn, *suspicious*, lacking in affection for her relatives, stingy, and as sometimes exhibiting a quick and explosive temper, of any probative value to show testamentary incapacity * *." [Italics added.] Thus, it is of no significance on the issue of testamentary capacity that Blanche changed her mind as to proportions of her bequests (other than the Dixons) so that O. W. Watkins, Jr. could not tell what she wanted. Nor does the evidence that she was mistrustful and suspicious of those who had been her friends, or that she thought the Dixons and others were stealing from her, raise any inference that she did not at the times she made such statements have testamentary capacity which would carry through to the time of the execution of the will in question.

According to Doctor McDonald's testimony that Blanche was a schizophrenic its most favorable consideration, *Byars*, supra, there was no evidence that schizophrenia, a split personality, was such a mental disorder which would result in testamentary incapacity. In fact, Doctor McDonald defined schizophrenia as "a psychiatric disorder that is characterized by progressive withdrawal from the environment or surroundings, with regression or slow deterioration of the emotional responses to those surroundings." The deterioration was in the control of the emotions, not in the intellect, which would be on an arteriosclerotic basis (there was no evidence that Blanche was afflicted with arteriosclerosis). And although Doctor McDonald acknowledged that a person who is a schizophrenic can be alert one day and demented the next; that it was *possible* that Blanche could have been demented on

August 29th, felt good on the 30th (when he saw her), been demented on the 31st (when she executed the will), felt good on the first, there is no showing that there existed any type of dementia which the jury could conclude would cause testamentary incapacity. The delusions which Blanche had as to having had a love affair with Nelson Eddy for at least 10 years did not have anything to do with her execution of her will under this record. Blanche's statement to Clovis McWilliams that the Dixons were stealing from her, and his attempt to dissuasion, show merely a delusion, suspicion or mistrust, not bearing on the issue of general lack of testamentary capacity. See *Klaus v. Zimmerman*, 174 S.W.2d 365, 370[11, 12] (Mo.App.1943), holding that statements made by deceased indicating hostility toward proponent beneficiaries, though competent, was insufficient, unsupported by any other facts constituting substantial evidence of mental incapacity, to make a case for the jury on that issue.

The testimony of Carrie Watkins, respondents' witness, does not aid them. She alluded only to the delusions Blanche had about Nelson Eddy, "That is why she is in the predicament she is in" (the predicament is unexplained). Carrie testified also about Blanche believing that certain of her friends were taking, using and disposing of her property, which, as noted above, could only be suspicions or mistrust, or at most a mere delusion not affecting execution of the will. Carrie did testify that Blanche was aware of what she owned, not ever losing that awareness.

Respondents rely upon *Whittlesey v. Gerding*, 246 S.W. 308 (Mo.1922). That case does say at page 312[5], "While we are mindful of the doctrine that mere eccentricities, idiosyncrasies and oddities of personal character and conduct are not evidence of such mental disease and deterioration as will render one incapable of making a valid will, nevertheless, where the peculiarities of thought and conduct cover a variety of subjects, where the testator has suffered from any particular mania, where he has entertained delusions and hallucinations, where his thought and action have been strange and abnormal for a number of years, and where these combined circumstances tend to show mental incapacity, the question becomes one for the jury." The facts in *Whittlesey*, wherein the foregoing standards were applied, are entirely inapposite to those here. There the testator thought that spirits were speaking to him, which caused him to pick up and move stones in his yard. He had been transported from different planets; and the spirits would move objects about in his room for him. He was also reported to have said he heard policemen outside his house plotting to kill him. Testator drove his car in a rapid and careless manner with a crazy laugh. His conversation was strange and rambling and he went into hysterics over pictures of his deceased wife. These facts are far different than those here, and would certainly justify a finding of general derangement as would authorize a jury's finding of lack of general testamentary capacity in that case. Here, no such facts exist. All that is in the record is that Blanche had a delusion about Nelson Eddy; she was suspicious, mistrustful, and perhaps deluded about her friends and acquaintances. No fact herein relates to her mental capacity to make a will, as to the factors thereof as set forth in the original opinion, 551 S.W.2d 894[4]. The trial court should have sustained proponents' motion for directed verdict.

The judgment is reversed and the case is remanded with directions to enter a judgment for appellants that the document in question is the last will and testament of Blanche W. Robinson, deceased.

All concur.